```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

                             - - -

THOMAS SKOLD,                    :   CIVIL ACTION NO. 14-5280
              Plaintiff          :
                                 :
                                 :
          v.                     :   Philadelphia, Pennsylvania
                                 :   July 1, 2016
GALDERMA LABORATORIES, L.P.,     :   8:03 o'clock a.m.
              Defendants         :
. . . . . . . . . . . . . .

                     JURY TRIAL - DAY 6
             BEFORE THE HONORABLE WENDY BEETLESTONE
                UNITED STATES DISTRICT COURT JUDGE

                             - - -

APPEARANCES:

For the Plaintiff:        MICHAEL D. LIPUMA, ESQUIRE
                          325 Chestnut Street
                          Suite 1109
                          Philadelphia, PA   19106

                          BRUCE W. CLARK, ESQUIRE
                          Clark Michie LLP
                          13 Carnegie Center
                          Suite 300
                          Princeton, NJ   08540

For the Defendants:       RICHARD D. ROCHFORD, ESQUIRE
                          JOSEPH LAWLOR, ESQUIRE
                          SARAH JACOBSON, ESQUIRE
                          Haynes & Boone LLP
                          30 Rockefeller Plaza, 26th Floor
                          New York, NY   10112

                             - - -

Audio Operators:          M. Mani/N. Phillippi

Transcribed by:           Tracey Williams, CET


(Proceedings recorded by For the Record Gold digital sound
recording; transcript produced by AAERT-certified
transcriber.)




                   Laws Transcription Service
                     48 W. LaCrosse Avenue
                     Lansdowne, PA 19050
                        (610)623-4178
```

1          (The following occurred in open court at 8:03

2    o'clock a.m.)

3          THE COURT:  Good morning.

4          ALL:  Good morning, your Honor.

5          THE COURT:  Good morning.  You can have a seat.

6          Very quickly, before we get to the jury

7    instructions, I have a letter from Mr. Anderson, who's Juror

8    No. 5.

9          "Dear Judge Beetlestone, there was a gentleman that

10   entered the courtroom during this afternoon's session.  He

11   sat in the back and was wearing a navy suit with a red tie

12   and wore glasses, he had a full head of gray hair.  I'm only

13   bringing this to your attention because he looks familiar to

14   me.  Perhaps this is David Glazer of Morgan Lewis & Bockius,

15   the attorney of which I showed you the email that referenced

16   him on Tuesday.  If it is him, I believe I only recognize him

17   because other individuals in our office suite use Morgan

18   Lewis & Bockius for legal counsel and he may have stopped in

19   from time to time.  Personally, I can't definitely say I've

20   ever met this man and I do not know him.  Who knows, maybe he

21   is just someone with a familiar face, someone who possibly

22   lives in my community, et cetera.  I really don't know where

23   I've seen him before, if it is someone I have encountered in

24   my past.  In any event, if his name is David Glazer, it would

25   have no impact on my ability to serve on this jury and render

1  a fair verdict.  Best Regards, Chris Anderson.  The office

2  suite I work in now, past three years, and the office suite I

3  worked in prior 15 years are/were comprised of independent

4  people and companies.  Some of these people were

5  (indiscernible) investors in the company I was formerly

6  employed by."

7            UNIDENTIFIED SPEAKER:  I don't write letters that

8  long to family members.

9            THE COURT:  Yes, this is the longest handwritten

10  note I've had in about 20 years, I would say.

11            MR. LIPUMA:  If I may, your Honor, may I just get

12  the description from the letter again, the physical

13  description?

14            THE COURT:  I know the gentleman he was talking

15  about.  He was sitting right in the back --

16            MR. LIPUMA:  That's Art Jackson.

17            UNIDENTIFIED SPEAKER:  Art Jackson.

18            MR. LIPUMA:  I think it's Art Jackson, Mr. Skold's

19  trademark attorney.

20            THE COURT:  Oh, okay.  So a tall guy, gray hair,

21  kind of good looking --

22            MR. LIPUMA:  Glasses, yes.

23            THE COURT:  -- glasses?

24            UNIDENTIFIED SPEAKER:  Yes, coming in and out.

25            MR. LIPUMA:  Yes, yes.

4

1          THE COURT:  Yeah, yeah, that was the guy.

2          UNIDENTIFIED SPEAKER:  He'll be happy to know that

3   you thought he was pretty good looking.

4          THE COURT:  He's a good-looking guy.  All of you are

5   good-looking guys.

6          (Laughter.)

7          THE COURT:  So I don't think this is a problem.  I

8   think he's being very diligent with respect to his duties,

9   but I think it's fine.

10          MR. LIPUMA:  Agreed, your Honor.

11          THE COURT:  Okay.

12          MR. MESCHES:  Agreed.

13          THE COURT:  So I have the negotiated components.  I

14   really appreciate that, thank you.  I need to know where to

15   put them, but let's just go through to make sure that there's

16   no edits to what I have.

17          So the introduction to the final charge, any edits?

18          MR. LIPUMA:  None for plaintiff, your Honor.

19          MR. MESCHES:  None for the defendants.

20          THE COURT:  Judging the evidence?

21          MR. LIPUMA:  Nothing from plaintiff, your Honor.

22          MR. MESCHES:  And nothing from us.  I actually --

23   your Honor, we did talk and I don't think either side had any

24   edits --

25          THE COURT:  To any of the -- okay.

5

1          MR. MESCHES:  -- to anything that we received.  So

2     just to short circuit, so you don't have to --

3          THE COURT:  Let's do that then.

4          MR. LIPUMA:  That's correct, your Honor.

5          THE COURT:  So any of the generic stuff that I put

6     in for every trial is fine.  So we start off with Point 1,

7     definition of trademark.

8          MR. MESCHES:  My only question, your Honor, is

9     whether it was your intent to have footnotes in --

10         THE COURT:  Well, that was -- yeah, that was the

11    question.  I -- my view is we should take the footnotes out,

12    but if there's a strong view to the contrary, I'm happy to

13    keep them in.

14         MR. LIPUMA:  I assume that's because we're assuming

15    the jury will take the instructions with them, your Honor?

16         THE COURT:  Well, that's a possibility, but the

17    question is -- the question is, what is this document going

18    to be used for, and I'm assuming that if there's an appeal by

19    either then this is something --

20         MR. LIPUMA:  I would suggest, if I may, your Honor,

21    that perhaps the official version that's filed would keep the

22    footnotes, but if we are going to allow the jury to take them

23    out, then perhaps it would be confusing to them and we would

24    take them out of that version.  I don't know if that's

25    logistically too difficult, but --

1          THE COURT:  It's logistically pretty difficult,

2   but --

3          MR. LIPUMA:  Then I would just suggest keeping them

4   in.  I don't think it will be a problem.

5          MR. MESCHES:  And I think we did discuss between --

6   obviously, it's your decision, your Honor, whether the

7   instructions should go to the jury --

8          THE COURT:  Yeah.

9          MR. MESCHES:  -- do you want to hear from us --

10          THE COURT:  Well, let's talk about it at the --

11          MR. MESCHES:  End --

12          THE COURT:  -- at the end --

13          MR. MESCHES:  -- okay.

14          THE COURT:  -- but I note that on the elements that

15   you've negotiated there are no footnotes.  So we're going to

16   have a little bit of a differential in that some of them will

17   have footnotes and some of them -- I don't really have a

18   position one way or the other, I just think we need a

19   decision to be made.

20          MR. MESCHES:  Just -- I think we just leave it how

21   you have it.

22          THE COURT:  Leave it as is?

23          MR. LIPUMA:  We're fine with that, your Honor.

24          THE COURT:  Okay.  So apart from that, Point Number

25   1, definition of trademark.

1            MR. LIPUMA:  Okay with plaintiff, your Honor.

2            MR. MESCHES:  Okay with the defendants.

3            THE COURT:  Point Number 2, trademark liability

4    policies.

5            MR. LIPUMA:  Okay with plaintiff, your Honor.

6            MR. MESCHES:  Okay with the defendants.

7            THE COURT:  Point Number 3, overview.

8            MR. LIPUMA:  Okay with the plaintiff, your Honor.

9            MR. MESCHES:  Same with the defendants.

10            THE COURT:  Point Number 4, elements of claims for

11   trademark infringement.

12            MR. LIPUMA:  Okay with plaintiff, your Honor.

13            MR. MESCHES:  Okay for the defendants.

14            THE COURT:  Point Number 6, trademark infringement

15   and unfair competition burden of proof.

16            MR. LIPUMA:  I believe that's Point Number 5, your

17   Honor?

18            THE COURT:  Oh, sorry, Point Number 5.

19            MR. LIPUMA:  That's okay with plaintiff, your Honor.

20            MR. MESCHES:  The same for the defendants.

21            THE COURT:  Point Number 6, how a trademark is

22   obtained.

23            MR. LIPUMA:  Okay with plaintiff, your Honor.

24            MR. MESCHES:  Okay for the defendants.

25            THE COURT:  So Point Number 7 was going to be the

8

1    effect of registration, formerly 10; is that the new document

2    that I have?

3              MR. LIPUMA:  That's correct.  There should -- yes,

4    that is --

5              THE COURT:  "There are two ways to establish legal

6    ownership of the trademark"?

7              MR. MESCHES:  Yes, your Honor.

8              MR. LIPUMA:  Yes, your Honor.

9              THE COURT:  Point Number 8, valid and protectable

10   trademark.

11             MR. LIPUMA:  Okay with the plaintiff, your Honor.

12             MR. MESCHES:  Same for the defendants.

13             THE COURT:  Point Number 9, ownership of trademark

14   burden of proof.

15             MR. LIPUMA:  Okay with plaintiff.

16             MR. MESCHES:  Same with the defendants.

17             THE COURT:  Point Number 10, interpretation of

18   contracts, directed verdict, as to 2002 agreement.

19             MR. LIPUMA:  Okay with plaintiff.

20             MR. MESCHES:  Yes for the defendants.  And I should

21   say, as I understood our discussion yesterday, your Honor,

22   we're just talking about sort of typo small things and we're

23   not --

24             THE COURT:  I know you don't agree with it.

25             MR. MESCHES:  -- agreeing -- okay.

9

1          THE COURT:  I know there's lots that you probably
2    don't agree with, but that's not what we're talking about.
3          MR. MESCHES:  Thank you, your Honor.
4          MR. LIPUMA:  And for the record, same with
5    plaintiff, we're not agreeing -- we're not waiving our
6    objections on legal issues.
7          THE COURT:  And you filed the draft proposed jury
8    instructions, so -- which contain your various points with
9    respect to jury charges?
10          MR. MESCHES:  That's correct, your Honor.
11          THE COURT:  Okay.
12          MR. LIPUMA:  Correct, your Honor.
13          THE COURT:  Okay.  So Point Number 10, apart from
14    that issue, and we don't have to say that issue again, but
15    Point Number 10 is fine.
16          Point Number 11, 2002 contract may be considered as
17    evidence of other matters.
18          MR. LIPUMA:  Okay for plaintiff, your Honor.
19          MR. MESCHES:  Same for the defendants, your Honor.
20          THE COURT:  Point Number 12, interpretation of
21    contract, 2004 agreement.
22          MR. LIPUMA:  Okay with plaintiff, your Honor.
23          MR. MESCHES:  Same for the defendants.
24          THE COURT:  Point Number 13, infringement,
25    likelihood of confusion.

1          MR. LIPUMA:  Okay with plaintiff.

2          MR. MESCHES:  Same for the defendants.

3          THE COURT:  Point Number 14, false advertising under

4     the Lanham Act elements.

5          MR. LIPUMA:  Okay with plaintiff, your Honor.

6          MR. MESCHES:  Okay for the defendants.

7          THE COURT:  Point 15, breach of contract elements.

8          MR. LIPUMA:  Okay with plaintiff.

9          MR. MESCHES:  Okay for the defendants.

10          THE COURT:  16, breach of contract.

11          MR. LIPUMA:  Okay with plaintiff.

12          MR. MESCHES:  Okay for the defendants.

13          THE COURT:  17, burden of proof on party bringing

14     contract action generally.

15          MR. LIPUMA:  Okay with plaintiff.

16          MR. MESCHES:  Okay for the defendants.

17          THE COURT:  Point Number 18, elements unjust

18     enrichment, all defendants except Galderma Labs, Inc.

19          MR. LIPUMA:  Okay with plaintiff.

20          MR. MESCHES:  Same for the defendants.

21          THE COURT:  Do you want me to read the title here,

22     because it's --

23          MR. MESCHES:  No --

24          THE COURT:  -- this all -- all defendants except

25     Galderma Labs, Inc.?

1           MR. MESCHES:  I don't think so.

2           THE COURT:  No?

3           MR. MESCHES:  I don't think so.

4           THE COURT:  Okay.  Plaintiff?

5           MR. MESCHES:  Your Honor, that is a question I had.

6    There was earlier a -- now that I think about it, a

7    description on the 2002 agreement instruction, Point Number

8    10, it says "interpretation of contracts, directed verdict as

9    2002 agreements."  I wonder if we might, on reflection, maybe

10   just say "interpretation of 2002 agreement"?

11          MR. LIPUMA:  That's fine with plaintiff, your Honor.

12          THE COURT:  Where -- so -- oh, instead of

13   "interpretation of contracts" --

14          MR. MESCHES:  Yeah, yeah.

15          THE COURT:  -- and instead of "directed verdict,"

16   just "interpretation of 2002 agreement"?

17          MR. MESCHES:  Yes, your Honor.

18          THE COURT:  Okay.  Now, I'm not reading the titles.

19          MR. MESCHES:  Oh, you're not reading the titles?

20          THE COURT:  I mean, you know, I will if you want me

21   to --

22          MR. MESCHES:  No, no, no, I think that's fine.  Then

23   ignore that suggestion; if you're not going to read the

24   titles, then I don't think it matters.

25          THE COURT:  Well, I'll just -- I still take that

12

1   out.

2          MR. MESCHES:  Okay, fine.  Thank you very much.

3          THE COURT:  So it will be just "interpretation of

4   2002 agreement."  Okay?

5          So 18 we were fine with.  Number 19, statute of

6   limitation for breach of contract.

7          MR. LIPUMA:  Okay with plaintiff, your Honor.

8          MR. MESCHES:  Okay for the defendants.

9          THE COURT:  20, formerly 33, discovery rule and

10  concealment or misrepresentation.

11         MR. CLARK:  Well, your Honor, can I revisit Number

12  19?

13         THE COURT:  Okay.

14         MR. CLARK:  Shouldn't it be a burden of proof

15  description on this point?  I don't recall, is the burden of

16  proof on the statute anywhere else in the instructions?

17         MR. MESCHES:  I have this recollection that in the

18  preliminary instruction --

19         THE COURT:  There is something -- well, there was an

20  affirmative defense instruction at the beginning of the

21  trial.

22         MR. MESCHES:  That's what I was recalling.

23         MR. CLARK:  But a number of the instructions that

24  we're working with today have specific reference to Mr. Skold

25  having to prove certain elements and it's repeated several

13

1  times with regard to the cause of action.  I think in balance

2  there should be a parallel burden of proof reference and with

3  regard to the statute of limitations specifically.

4          THE COURT:  Well, there's a --

5          MR. CLARK:  I mean, for example, if you just look at

6  18, "to prevail on a claim of unjust enrichment, Mr. Skold

7  must prove," and that "Mr. Skold must prove" appears several

8  times in the various points, so I think it's fair to do it

9  here.

10         MR. MESCHES:  I think if you've already given an

11  instruction about the burden of proof at the outset of the

12  trial that's probably sufficient, but if not --

13         THE COURT:  But I'm doing it again for -- if I'm

14  doing it again for the claims -- I mean, what I read in the

15  preliminary was, "On certain issues called affirmative

16  defenses, defendants have the burden of proving the elements

17  of the defense by a preponderance of the evidence.  I will

18  instruct you on the facts that will be necessary to find on

19  this affirmative defense.  An affirmative defense is proven

20  if you find, after considering all evidence in the case, that

21  defendants have succeeded in proving that the required facts

22  are more likely so than not so."

23         MR. MESCHES:  So I think the defendants, your Honor,

24  would be okay with a statement maybe in Point 19 that says,

25  "The defendants have the burden to prove their statute of

14

1   limitations defense" --

2          (Pause.)

3          MR. LIPUMA:  Would it be better in 20?

4          THE COURT:  What?

5          MR. LIPUMA:  I'm just wondering where -- I guess

6   it's cleaner if it's in 19.

7          THE COURT:  Well, what I was going to do was add to

8   the bottom of 19, "The defendants have the burden to prove

9   the statute of limitations defense by a preponderance of the

10  evidence."

11         MR. MESCHES:  That's --

12         MR. LIPUMA:  Thank you, your Honor.

13         THE COURT:  Okay?

14         MR. MESCHES:  That's okay with the defendants.

15         THE COURT:  Okay.  So, okay, we've gone through 20;

16  that was fine by everybody, right?

17         MR. MESCHES:  Right.

18         MR. LIPUMA:  Yes, your Honor.

19         THE COURT:  And then the 21 and 22 are replaced by

20  your 21 and your 22?

21         MR. LIPUMA:  Correct, your Honor.

22         MR. MESCHES:  That is correct, your Honor.

23         THE COURT:  And 23 is now gone; is that right?

24         MR. LIPUMA:  That's correct, your Honor.

25         MR. MESCHES:  Yes.

15

```
 1              THE COURT:  24 is now gone?
 2              MR. MESCHES:  Correct.
 3              MR. LIPUMA:  Correct.
 4              THE COURT:  25 is now gone?
 5              MR. MESCHES:  Yes.
 6              MR. LIPUMA:  That's correct.
 7              THE COURT:  Okay.  So then we go to 26, which will
 8    now become 23, punitive damages, Pennsylvania Unfair
 9    Competition.  And then 24 will be punitive damages, amount of
10    damages.  And then we have our deliberations.
11              MR. LIPUMA:  And all of those are acceptable to
12    plaintiff, your Honor -- I haven't seen the deliberation one,
13    23 and 24 are good with us, your Honor.
14              MR. MESCHES:  The deliberation, Michael, was it --
15              MR. LIPUMA:  In the general package and that's fine
16    with us.
17              THE COURT:  That's fine?
18              MR. MESCHES:  Yeah, we're --
19              MR. LIPUMA:  I didn't know if there was an extra one
20    at the end, but yeah, that --
21              THE COURT:  Okay.  Well, we'll get this done.  I'll
22    make sure you get these in plenty of time.
23              I have a plea scheduled for 9:00.  Now, I'm sort of
24    playing a little with the U.S. Marshals here.  I would prefer
25    to charge the jury first, because I want them to have lots of
```

1   time and charging is going to take me probably about half an

2   hour, but the prisoner can wait in the holding cell.  So what

3   I would like to do is -- they're usually a little late, my

4   point is they're usually late bringing in the prisoner.  So

5   if we can start here at 9:00 and just be ready to go.  Then

6   they're going to have to wait a little bit, but then I get my

7   jury to have a longer period of time.

8           MR. LIPUMA:  Yes, your Honor, we had a couple of

9   housekeeping issues we've been discussing.

10          THE COURT:  Yes, okay.

11          MR. LIPUMA:  The one is --

12          THE COURT:  Hold on.  Katie, why don't you go out

13  and --

14          MR. LIPUMA:  I think the first, your Honor, relates

15  to the issue of the instructions and whether the jury will be

16  able to take them with them or not.

17          THE COURT:  Well, was that part of your negotiations

18  of the verdict sheet?

19          MR. LIPUMA:  We talked about it, but I don't think

20  we reached a final decision about it.  Is that fair?

21          MR. MESCHES:  I think that's fair.

22          MR. LIPUMA:  Mr. Michie was doing most of it, but I

23  think that's fair.

24          MR. MESCHES:  And so it was -- I think it was our

25  view the instructions don't need to go back with the jury

1  given the sort of pinpoint specificity in the verdict form.

2  That would be our view; I don't know if plaintiffs share that

3  view, but that's our view.  We think given that and the

4  closings they heard yesterday, they were probably --

5       MR. LIPUMA:  We've been on the fence about it, your

6  Honor.  I think the decision that we reached this morning was

7  that it would be better to go out, in light of the length and

8  the complexity of the instructions.  This way if they want to

9  make reference to what your Honor said, especially since

10  they're not taking notes in the box, that it would be better.

11       THE COURT:  Well, I mean, one of the things that --

12  I have yet to send them out, but that doesn't mean that I'm

13  philosophically opposed to doing it.

14       One thing that we have done in the past is, I think

15  it was in a conspiracy case, because the conspiracy

16  instruction is very, very complicated, they came and asked

17  for them, and when they asked for them, we provided them.  So

18  that's one --

19       MR. LIPUMA:  That's fine with us, your Honor.

20       THE COURT:  Okay.  And they will -- juries are

21  actually quite amazing, they really are very serious about

22  their job.  So if they ask, we agree now that I can give them

23  any jury instruction that they ask for?

24       MR. LIPUMA:  That's fine with us, your Honor.

25       MR. MESCHES:  That's absolutely fine with us, your

18

1    Honor --

2              THE COURT:  Okay.

3              MR. MESCHES:  -- yes.

4              THE COURT:  So next?

5              MR. LIPUMA:  Second, your Honor, is the issue of

6    exhibits and the jury taking exhibits out.

7              THE COURT:  Yes.

8              MR. LIPUMA:  We were chatting a little bit about it

9    beforehand, I think obviously we're both good with it.  I

10   think the plan logistically was to pull anything from the

11   book that was not admitted.

12             We had two issues, I think:  Do we give them the

13   table of contents?  If we do, do we need to redact it,

14   because certain things weren't admitted; certain things

15   weren't admitted for the truth, they were only admitted for

16   some other purpose.  I think on a balance maybe it's better

17   that we don't give them the table contents --

18             THE COURT:  I'm wondering whether you want to give

19   them the entire book, because if they get the entire book,

20   they're going to burrow right into it.  I mean, we can do

21   that.  If I do that, you have to pull out all the documents

22   that haven't been admitted and you have to take out the table

23   of contents, or we do the table of contents.

24             I have a little concern about the fact that there

25   were a lot of documents that were admitted, but there was no

1   testimony about.  And so what you have is suddenly you have a

2   jury looking into these documents, they don't know -- they

3   just read them, they don't have any testimony to guide them

4   on what they mean.

5          You know, one -- there's a number of -- well, sort

6   of the continuum of options.  One is give everything up

7   front; two is decide on key documents that they take out with

8   them when they go out; three is, if they ask for a document,

9   you give them the document.

10          I suppose the problem with the middle option is that

11   you guys may not agree on which documents should go out.

12          MR. LIPUMA:  I think that's --

13          MR. MESCHES:  That's probably fair to say.

14          MR. LIPUMA:  -- I think that's probably right.

15          (Laughter.)

16          THE COURT:  Well, I'm really loathe to give them the

17   whole book, I really am, because I think it's going to -- you

18   know, there's nothing good that will come of that.

19          MR. MESCHES:  Well, then in that case, what about

20   the approach that you have suggested with respect to the jury

21   instructions, which is if they ask for something, they get

22   it?  That might be --

23          MR. LIPUMA:  We have a slightly different view, your

24   Honor, the fact that certain exhibits were admitted without

25   witness testimony --

1        THE COURT:  Yeah.

2        MR. LIPUMA:  -- we actually feel like they should

3  have those, so that they can look and see what the whole

4  context -- the context of those documents were, certain

5  emails that were --

6        THE COURT:  But is that evidence?

7        MR. LIPUMA:  I think if it was brought -- if it was

8  admitted, your Honor, I would respectfully submit that it is.

9        THE COURT:  I don't know, I really don't know the

10  answer to that question, because -- I mean, I suppose if you

11  look at the definition of evidence, I say documents and

12  testimony and what have you, but here we have documents that

13  nobody has ever testified about.

14        MR. CLARK:  Your Honor, maybe the thing to do is,

15  maybe we should confer on this some more and see if we can

16  reach an agreement on what to do.

17        THE COURT:  There are some basic things, right, that

18  you're going to agree to?  You're going to agree that the

19  2004 agreement should go out, right?

20        MR. LIPUMA:  Yes.

21        THE COURT:  You're probably going to agree that the

22  2002 agreement should go out.  You're probably going to agree

23  that the letter -- that the cancellation letter goes out,

24  right?  So those -- and, you know, I've got three --

25        (Laughter.)

1        THE COURT:  -- that you definitely are going to

2   agree to.  So, you know, what you might think of is there are

3   core documents that are just the -- sort of the taxonomy of

4   the case and they're not about your particular theories of

5   the case.  So perhaps you can agree on that core group and we

6   send those out with the jury.  And then if they ask for

7   anything else, I'm not going to give them anything unless I

8   bring you back into the courtroom, have a discussion about

9   what they've asked for and then give it to them.  But that

10  way, instead of having this overwhelming two-binder set, they

11  can build on what they get.

12        MR. LIPUMA:  We're willing to take a shot at it,

13  your Honor.

14        MR. MESCHES:  Yeah, I mean, we will make an effort

15  of course to agree, I am concerned we're not going to be able

16  to reach an agreement.

17        THE COURT:  Well, as soon as you stop agreeing, it's

18  over, you know.

19        MR. CLARK:  So it will be limited to just those

20  items we agree on --

21        THE COURT:  Just the ones that you --

22        MR. CLARK:  -- and if we don't --

23        THE COURT:  -- everyone says yep --

24        MR. CLARK:  -- then we don't?

25        THE COURT:  -- and -- but there's no discussion.  If

22

1    you go through the documents and you say no, then that's it

2    for now.  I mean, it doesn't mean that when they ask -- this

3    is just the set that will go out with them immediately when

4    they start deliberating, it doesn't mean that if they ask for

5    something that they don't get it.

6              MR. MESCHES:  The only thing I want -- I mean,

7    obviously on the key core documents we can reach agreement, I

8    just wonder if it's giving an impression that some exhibits

9    they've heard are more important pieces of evidence than

10   others.

11             THE COURT:  It may be, yeah.

12             MR. MESCHES:  And I -- and so -- because I do think

13   there are things we're going to be able to agree to, but

14   there's also things that are really important from our

15   perspective that I'm doubtful that we'll be able to reach

16   agreement on.  And so --

17             THE COURT:  So your view is either everything or

18   nothing and wait for them to ask?

19             MR. MESCHES:  I think that's right, your Honor.

20             MR. LIPUMA:  May I consult with Mr. Clark --

21             THE COURT:  You may --

22             MR. LIPUMA:  -- and just --

23             THE COURT:  -- yeah.

24             MR. LIPUMA:  Thanks, your Honor.

25             (Pause.)

1          MR. LIPUMA:  May I -- Ben, if I may?  So it's your

2     suggestion that we just let all of them go, is that where you

3     guys are with it?

4          MR. MESCHES:  It's either let all of them go or just

5     on demand by the jury.

6          MR. LIPUMA:  I think, your Honor, our position

7     respectfully, I understand your Honor's concern about them

8     being overwhelmed by the two binders, I think --

9          THE COURT:  Well, I'm concerned that there are a lot

10    of documents that have had no testimony.

11         MR. LIPUMA:  Yes, I understand both of those

12    concerns.

13         THE COURT:  Yes.

14         MR. LIPUMA:  I think on balance our position is that

15    they should all go out, but again --

16         THE COURT:  Okay.

17         MR. LIPUMA:  -- with respect for your Honor's

18    consideration.

19         THE COURT:  So then I'm going to -- you know, you're

20    -- I'm just calling balls and strikes here and, you know, if

21    you're in agreement and there's no countervailing issue -- or

22    no countervailing issue that counsel requires that I not send

23    them out, I'm fine with that, but what you need to do is to

24    edit the binder so that you don't have the documents that

25    have not been admitted.  And I think we went through, so

24

1    everyone should be on the same page with what has been

2    admitted.

3             Do you have a capability of editing your -- and

4    printing out, or do you need us to print it out?

5             MR. LAWLOR:  We're working on that now, your Honor,

6    to make that a clean version that we'll try and reach

7    agreement on.

8             THE COURT:  Okay.  So when you edit it, the numbers

9    are not going to change, right?

10            MR. LAWLOR:  It will just be blanks for the ones

11   that --

12            THE COURT:  It will be blanks, okay, okay.

13            Okay.  Anything else?

14            MR. LIPUMA:  And may -- just logistically, is that

15   the binder that we should be working from there --

16            THE COURT:  If you put that there --

17            MR. LIPUMA:  -- to the left of Mr. Mani?

18            THE COURT:  -- and that's --

19            MR. LIPUMA:  Okay.

20            THE COURT:  -- yeah.

21            MR. LIPUMA:  Thank you, your Honor.  The only -- the

22   last issue is, does your Honor permit Counsel to speak with

23   the jurors, if the jurors so choose, after the verdict is

24   rendered and we're out in the hallway or whatever?

25            THE COURT:  You mean -- out in the hallway?

1          MR. LIPUMA:  Like after we're done.  I know --

2          THE COURT:  So how I have allowed it is to -- after

3    the verdict is in, I will offer go down -- go into the jury

4    room and talk with them.  And if you want to talk with them,

5    you can talk with them.  But I think you -- I'm a little

6    uncomfortable with that.  And I have allowed it, but I'm a

7    little uncomfortable, because I don't want you to ask about

8    the substance of the case.  If you want to say, you know,

9    what do you think of my presence in the courtroom?  You know,

10   how did you think when I approached the witness?  That kind

11   of stuff, that's fine.  But my concern is that if, you know,

12   well, what was your view, why did you think, you know, this

13   happened rather than that happened, that becomes problematic.

14          And if you want to go back, I would want five or ten

15   minutes or so with them, and I would ask them if they would

16   like to talk to you.

17          MR. LIPUMA:  That's -- of course, your Honor,

18   however your Honor would want to do it.

19          MR. MESCHES:  That's -- we'll defer to your --

20          THE COURT:  Okay.  And you do, you all want to talk

21   to them?

22          MR. LAWLOR:  It's hard to say, your Honor.  Probably

23   not but, you know, we'll defer it.

24          THE COURT:  Okay.  So what --

25          MR. LIPUMA:  I'm always curious win or lose, your

1    Honor, but I completely understand your Honor's concern and

2    we'll --

3              THE COURT:  Well, remember, you're not going to talk

4    to them about why they reached their verdict --

5              MR. LIPUMA:  Right, right --

6              THE COURT:  -- absolutely --

7              MR. LIPUMA:  -- yes, right.

8              THE COURT:  -- not.

9              MR. LIPUMA:  Yes, I totally understand that, your

10   Honor.

11             MR. LAWLOR:  That was the context in which I

12   answered that I don't view it as particularly meaningful --

13             THE COURT:  Yeah.  I mean, and I --

14             MR. LAWLOR:  -- other than to --

15             THE COURT:  -- I mean, I will also sometimes ask

16   them, if the lawyers don't go back, you know, what do you

17   think of the lawyers, and I'm happy to talk to you about it.

18   Sometimes people are not so happy to hear what the jury has

19   to --

20             MR. CLARK:  I'm not sure if my frail ego could take

21   that, your Honor.

22             THE COURT:  Well, right, it's an ego issue, but --

23             (Laughter.)

24             MR. LIPUMA:  No, really it was more for that just

25   we've been together, but unable to talk to them, and then a

27

1   moment of social interaction.

2          THE COURT:  Yeah.

3          MR. LIPUMA:  But I'm fine if not either, your Honor.

4   So, yeah.

5          THE COURT:  Well, I will ask if they would like to

6   talk to me afterwards.  Sometimes they say yes, sometimes

7   they just want to get out of here.  It's a holiday weekend

8   and if they say no, I'm letting them go.

9          MR. LIPUMA:  Of course.

10          THE COURT:  I'll go and talk to them.  I'll ask them

11   if they want to talk to you and, if that's the case, I'll

12   send out Mr. Mani to get you.

13          Okay.  Anything else?

14          MR. LIPUMA:  None for my plaintiff, your Honor, no

15   issues from plaintiff.

16          THE COURT:  Okay, good.  Well, half an hour,

17   hopefully.

18          (Discussion held off the record.)

19          THE COURT:  So Mr. Mani has undermined the best

20   plans, because he's ordered them breakfast and he told them

21   don't worry, we have a guilty plea, so if you can roll in a

22   little late, it's fine.  So probably I'm going to have to do

23   my guilty plea first and you can blame him.

24          (Laughter.)

25          MR. LIPUMA:  Thanks, your Honor.

 1            (Court in recess; 8:28 to 9:48 o'clock a.m.)

 2            (Jury entered the courtroom.)

 3            THE COURT:  Good morning.

 4            THE JURY:  Good morning.

 5            THE COURT:  Now that you have heard all of the

 6   evidence to be received in this trial, it becomes my duty and

 7   my privilege to give you the final instructions -- you can

 8   have a seat -- as to the law that will guide you in your

 9   decisions.  I'll start by giving you instructions that apply

10   to all civil cases, then I'll instruct you on the law

11   specifically applicable to this case.

12            All of the instructions on the law given to you by

13   the Court, those given to you at the beginning of the trial,

14   those given to you during the trial and these final

15   instructions, must guide and govern your deliberations.  It

16   is your duty as jurors to follow the law as stated in all of

17   the instructions of the Court and to apply these rules of law

18   to the facts as you find them from the evidence received

19   during the trial.

20            You're not to single out one instruction alone as

21   stating the law, but must consider the instructions as a

22   whole.  You should construe each of the instructions in light

23   of and in harmony with the other instructions, and you should

24   apply the instructions as a whole to the evidence.  The order

25   in which the instructions are given has no significance and

Charge of the Court                     29

1   is no indication of their relative importance.

2          Counsel may have referred to some of the applicable

3   rules of law in their closing arguments to you.  If any

4   difference appears to you between the law as stated by

5   Counsel and that as stated by the Court in these

6   instructions, you are to be governed by the instructions

7   given to you by the Court.

8          You must not be concerned with the wisdom of any

9   rule of law stated by the Court.  Regardless of the opinion

10  you may have as to what the law ought to be, it would be a

11  violation of your sworn duty to base any part of your verdict

12  upon any view of the law other than that given in these

13  instructions.

14         It would also would be a violation of your sworn

15  duty as the judges of the facts to base your verdict upon

16  anything but the evidence received in this case.

17         You were chosen as jurors in this trial in order to

18  evaluate the evidence received and to decide the factual

19  questions presented by the respective positions of plaintiff

20  and of defendants.  In deciding the issues presented to you

21  for decision in this trial you must not be swayed by bias,

22  prejudice or sympathy for or against any of the parties, nor

23  influenced by public opinion.

24         Justice through trial by jury depends upon the

25  willingness of each individual juror to evaluate the same

Charge of the Court                    30

1   evidence presented to all of the jurors here in the courtroom

2   and to arrive at a verdict by applying the same rules of law

3   that I am giving you now in these instructions.

4        At times during the trial you saw lawyers made

5   objections to questions asked by other lawyers and answers by

6   witnesses.  This simply meant that the lawyers were asking me

7   to make a decision on a rule of law.  Do not draw any

8   conclusion from such objections or from my rulings on them.

9   Those related only to the legal questions that I had to

10  determine and should not influence your thinking.

11       When I sustained an objection to a question, the

12  witness was not allowed to answer it.  Do not attempt to

13  guess what answer might have been given had I allowed the

14  question to be answered.  Similarly, if I told you not to

15  consider a particular statement, you were told to put that

16  statement out of your mind and you may not refer to that

17  statement in your deliberations.

18       During the course of the trial we've had from time

19  to time conferences at sidebar out of the hearing, hopefully,

20  of the jury.  These conferences were held to resolve legal

21  issues which arose during the trial.  Please do not speculate

22  about what was said or decided at these sidebar conferences;

23  do not consider them in any way in reaching your verdict.

24       If I have said anything or done anything during

25  trial or instructing you now that leads you to believe that I

Charge of the Court                                    31

1    am inclined in favor in the case of any party, you must

2    remove that impression from your minds and not permit

3    yourself to be influenced by it, because none was intended to

4    be created.

5         There's nothing particularly different in the way

6    that a juror should consider the evidence in a trial than in

7    which any reasonable and careful person would treat any very

8    important question that must be resolved by examining facts,

9    opinions and evidence.  You're expected to use your good

10   sense in considering and evaluating the evidence in the case

11   for only those purposes for which it has been received, and

12   to give such evidence a reasonable and fair construction in

13   the light of your common knowledge of human nature.

14        Keep in mind that it would be a violation of your

15   sworn duty to base a verdict upon anything other than the

16   evidence received in the case and the instructions of the

17   Court.

18        The party with the burden of proof on any given

19   issue has the burden of proving every disputed element of his

20   or her claim to you by a preponderance of the evidence.  If

21   you conclude that the party bearing the burden of proof has

22   failed to establish that claim by a preponderance of the

23   evidence, you must decide against that party on the issue you

24   are considering.

25        So what does preponderance of the evidence mean?  To

1   establish a fact by a preponderance of the evidence means to

2   prove that the fact is more likely true than not.  A

3   preponderance of the evidence means the greater weight of the

4   evidence; it refers to the quality and persuasiveness of the

5   testimonial and documentary evidence, not to the number of

6   exhibits or witnesses.  The weight of the evidence to prove a

7   fact does not necessarily depend on the number of witnesses

8   who testify or the number exhibits admitted into evidence.

9   What is more important is how to believe -- is how believable

10  the witnesses were and how much weight you think that their

11  testimony deserves.

12          If you find that the credible evidence on a given

13  issue is evenly decided between the parties such that it is

14  equally probable that one side is right as it is that the

15  other side is right, then you must decide that issue against

16  the party having the burden of proof.  That is because the

17  party bearing this burden must prove more than simple

18  equality of evidence; he must prove the issue by a

19  preponderance of the evidence.

20          On the other hand, the party with the burden of

21  proof need prove no more than a preponderance.  So long as

22  you find that the scale tips however slightly in favor of the

23  party with the burden of proof that what the party claims is

24  more likely true than not true, then that element will have

25  been proved by a preponderance of the evidence.

1          Some of you may have heard of proof beyond a

2     reasonable doubt, which is the proper standard of proof in a

3     criminal trial.  That level of proof does not apply to a

4     civil case such as this and you should put it out of your

5     mind.

6          Let's now talk about the evidence received in the

7     case.  The evidence in this case consists of the sworn

8     testimony of the witnesses, regardless of who may have called

9     them; all exhibits received in evidence, regardless of who

10    may have produced them; and all facts which may have been

11    agreed to or stipulated.

12         A stipulation of facts is an agreement among the

13    parties that a certain fact is true.  Such stipulations are

14    part of the evidence in this case.  You may regard such

15    agreed facts as having been proved; you are not required to

16    do so, however, since you are the sole judges of the facts.

17         During the trial, several items were received into

18    evidence as exhibits.  These exhibits will be sent into the

19    jury room with you when you begin to deliberate.  Examine the

20    exhibits, if you think doing so will help you in your

21    deliberations.  Any proposed testimony or proposed exhibits

22    to which an objection was sustained by the Court and any

23    testimony or exhibit ordered stricken by the Court must be

24    entirely disregarded.

25         Likewise, anything you may have seen or heard

1   outside the courtroom is not proper evidence and must be

2   entirely disregarded.  Any testimony that I have stricken

3   from the record is not evidence and should not be considered

4   by you in your deliberations.  This means that even though

5   you may remember the testimony, you are not to use it in your

6   discussions or deliberations.

7           Further, if I gave a limiting instruction as to how

8   to use certain evidence, that evidence must be considered by

9   you for that purpose only; you cannot use it for any other

10  purpose.

11          Questions, objections, statements, and arguments of

12  Counsel are not evidence in this case.  If a lawyer asked a

13  question on cross-examination which incorporated a statement

14  which assumed certain facts to be true, the question is not

15  evidence of those facts if the witness denied the truth of

16  the statement in his or her answer.  You may consider the

17  facts incorporated into a question only if the answer of the

18  witness recognizes the truth.  In short, questions are not

19  evidence, answers are.

20          You are to base your verdict only on the evidence

21  received in this case.  In your consideration of the evidence

22  received, however, you're not limited to the bald statements

23  of the witnesses or to the bald assertions in the exhibits.

24  In other words, you're not limited solely to what you see and

25  hear as the witnesses testify or as the exhibits are

1  admitted.  You are permitted to draw from the facts which you

2  find have been proved such reasonable inferences as you feel

3  are justified in the light of your experience and your common

4  sense.  Inferences are simply deductions or conclusions which

5  reason and common sense lead the jury to draw from the

6  evidence received in the case.

7           There are two types of evidence, and I think I

8  talked to you about these at the beginning of the trial,

9  which are generally presented during the trial:  direct

10  evidence and circumstantial evidence.

11          Direct evidence is the testimony of a person who

12  asserts or claims to have actual knowledge of a fact, such as

13  an eyewitness.  Circumstantial evidence is proof of a chain

14  of facts and circumstances indicating the existence or

15  nonexistence of a fact.  The law makes absolutely no

16  distinction between the weight or value to be given to either

17  direct or circumstantial evidence, but simply requires that

18  you find the facts from a preponderance of all of the

19  evidence, both direct and circumstantial.

20          You should weigh all the evidence in the case.

21  After weighing all the evidence, you must decide if a

22  plaintiff has satisfied his burden of proving each element of

23  the case by a preponderance of the evidence.

24          If any reference by the Court or by Counsel to

25  matters of testimony or exhibits does not coincide with your

Charge of the Court                    36

1  own recollection of that evidence, it is your recollection

2  which should control during your deliberations and not the

3  statements of the Court or Counsel.  You are the sole judges

4  of the evidence received in the case.

5        There were times when you were asked to draw

6  different inferences from the same facts.  It is for you and

7  you alone to decide what reasonable inferences you choose to

8  draw from the evidence in this case.

9        Now, I have said that you must consider all of the

10 evidence; this does not mean, however, that you must accept

11 all of the evidence as true or accurate.  You are the sole

12 judges of the credibility or believability of each witness

13 and the weight to be given to his or her testimony.

14       You're called upon to resolve various issues of fact

15 concerning the respective allegations of the parties.  How do

16 you determine where the truth lies?  Your determination of

17 the credibility or believability of a witness depends largely

18 upon the impression the witness made upon you as to whether

19 or not he or she was giving an accurate and truthful version

20 of what occurred.

21       In weighing the testimony of a witness, you should

22 consider his or her interest, if any, in the outcome of the

23 case; his or her manner of testifying; and the extent to

24 which he or she has been supported or contradicted by other

25 credible evidence.  You may accept or reject the testimony of

1   any witness in whole or in part.  You must use your common

2   sense, your good judgment and your experience.  In other

3   words, what you must try to do is to size a person up just as

4   you would in any important matter where you are undertaking

5   to determine whether or not a person is truthful, candid and

6   straightforward.

7           In passing upon the credibility of a witness, you

8   may also take into account inconsistencies or contradictions

9   as to material matters in his or her own testimony; the

10  length of time which has passed since the events testified

11  about; and any conflict between his or her testimony and the

12  testimony of another witness.  A witness may be inaccurate,

13  contradictory or even confused in some minor respects and yet

14  be entirely credible in the essentials of his or her

15  testimony.

16          The ultimate question for you in deciding and

17  passing upon credibility is did the witness tell the truth.

18  It is for you to say whether his or her testimony at this

19  trial was truthful in whole or in part in light of the

20  demeanor, the explanations and all of the evidence in the

21  case.

22          If a witness is shown knowingly to have testified

23  falsely concerning any material matter, you have a right to

24  distrust such witness' testimony in other particulars, and

25  you may reject all of the testimony of that witness or you

Charge of the Court                    38

1    may give it such credibility as you think it deserves.

2              Inconsistencies or discrepancies in the testimony of

3    a witness, or between the testimony of different witnesses,

4    may or may not cause the jury to discredit such testimony.

5    Two or more persons witnessing an incident or transaction may

6    see or hear it differently.  Innocent misrecollection or a

7    failure of recollection is not an unusual or uncommon

8    experience.  It's entirely possible, for example, that a

9    witness can accurately recall the occurrence of a given

10   event, but cannot recall the exact date on which the event

11   occurred.

12             Evidence including a witness' statement or report or

13   testimony before trial showing that a witness said or failed

14   to say something before which is inconsistent with the

15   witness' testimony at trial may be considered by you for the

16   sole purpose of judging the witness' credibility.  You may

17   likewise consider whether a witness who now claims to recall

18   an event that he or she was unable to recall at an earlier

19   date is credible in such testimony at trial.

20             The extent to which such inconsistencies or

21   omissions affect the witness' credibility is for you to

22   determine.  In weighing the effect of a discrepancy, you are

23   to consider whether it pertains to a matter of importance or

24   to an important detail; and, further, whether the discrepancy

25   results from innocent error or from willful falsehood.

1    During the course of the trial the parties have

2  sometimes challenged the testimony of certain witnesses by

3  pointing to prior statements the witness allegedly made.   In

4  considering this evidence, you must separate these prior

5  statements into statements that were not made under oath and

6  statements that were made under oath.

7    You may consider prior statements that were not made

8  under oath solely for the purpose of impeachment; that is,

9  you may consider them only to help you decide if you believe

10  the witness' testimony.   For example, if the witness said

11  something previously that conflicts with what he or she said

12  here in court, there may be reason for you to doubt that

13  witness' testimony.   That's for you to decide.   You are not

14  permitted, however, to use these earlier statements as

15  affirmative substantive evidence in this case.

16    Now, prior statements that were made under oath, for

17  example at a deposition or in an affidavit, an answer to a

18  written interrogatory or a sworn certification, should be

19  treated just as if they were made here in court.   You may

20  consider them for the purposes of impeachment as above, but

21  you may also consider them as affirmative substantive

22  evidence.   You may rely on these statements as much or as

23  little as you think proper.   It is exclusively your duty to

24  determine whether the prior statement was inconsistent and,

25  if so, the significance of the inconsistency and how much

1    weight it should be given.

2            I'm now going to move into instructions that pertain

3    specifically to the claims in this case.

4            A trademark is any word, name, symbol, or device, or

5    any combination thereof, used by a person to identify and

6    distinguish that person's goods from those of others and to

7    indicate the source of the goods, even if that source is

8    generally unknown.

9            Trademark law protects owners in the exclusive use

10   of their marks when use by another is likely to cause

11   confusion.  The trademark law serves the dual goals of

12   protecting the trademark owners good will, which he spent

13   energy, time and money to obtain, and ensuring the public's

14   ability to distinguish among the goods of competing

15   manufacturers.  The purpose of trademark law is to prevent

16   confusion about the source of products and to permit

17   trademark owners to show ownership of their products and

18   control their product's reputation.

19           This is a case between the plaintiff, Thomas Skold,

20   and the defendants, Galderma Laboratories, L.P.; Galderma

21   Laboratories, Inc.; Galderma S.A.; and Nestle Skin Health,

22   S.A.; known together as the defendants.

23           Mr. Skold has asserted claims against all or some of

24   the defendants for breach of contract, for trademark

25   infringement under federal law, for false advertising under

Charge of the Court                    41

1    federal law and unfair competition under federal law, unfair

2    competition under Pennsylvania law, and unjust enrichment,

3    each claim relating to the trademark Restoraderm.

4         Defendants deny each of Mr. Skold's claims and also

5    assert that his breach of contract claim is barred by the

6    statute of limitations.

7         Turning first to trademark infringement and unfair

8    competition.  To prevail on a claim for trademark

9    infringement under federal law and for unfair competition

10   under federal and Pennsylvania law, Mr. Skold must prove

11   three elements:  first, that the mark is valid and legally

12   protectable; second, that Mr. Skold owns the mark; and,

13   third, that defendants use of the mark is likely to cause

14   confusion concerning the source of the goods.

15        On each of the claims Mr. Skold bears the burden of

16   proof of each element of the claim by a preponderance of the

17   evidence.

18        A person acquires the right to exclude others from

19   using the same mark or a similar mark that is likely to cause

20   confusion in the marketplace by being the first to use it in

21   the marketplace or by using it before the alleged infringer.

22   Rights in a trademark are obtained only through commercial

23   use of the mark.  After the owner of the trademark has

24   obtained the right to exclude others from using the

25   trademark, the owner may obtain a certificate of registration

Charge of the Court                    42

1    issued by the United States Patent and Trademark Office and

2    may submit that certificate as evidence of the certificate

3    holder's ownership of the trademark covered by the

4    certificate.

5            There are two ways to establish legal ownership of a

6    trademark.  First, a party can establish ownership by being

7    the first person to use the name and by continuously using

8    the name in commerce thereafter.  In this situation, the

9    trademark does not need to be registered to obtain

10   protection.  This is what Mr. Skold claims he did with the

11   Restoraderm trademark.

12           Second, a person can establish ownership by

13   registering the trademark with the United States Patent and

14   Trademark Office.  This is what Galderma did with the

15   Restoraderm trademark.

16           Under the law, the filing of an application to

17   register a trademark confers a right of property -- priority

18   against any other person who attempts to use the trademark

19   with one exception.  The exception is for a person who prior

20   to such a filing has used the trademark continually in

21   commerce.

22           So in this case one of the things you have to decide

23   is whether Mr. Skold was the first person to use the name

24   Restoraderm and whether he used the name continuously in

25   commerce up until the 2002 agreement.  If so, he owned the

Charge of the Court                    43

1    trademark up to that point; if not, he didn't own it.

2              As I told you, the first element which must be

3    proved to establish the claim of trademark infringement and

4    unfair competition is that the trademark is valid and

5    protectable.

6              A valid trademark is a word, name, symbol, device,

7    or any combination of these that indicates the source of

8    goods and is sufficiently distinctive so as to distinguish

9    those goods from the goods of others and to identify the

10   source of the goods.  A trademark becomes protectable after

11   it is used in commerce and I'll explain usage more in one

12   moment.

13             The second element of the claim is ownership of the

14   trademark.  If Mr. Skold can prove that he established

15   ownership rights by usage prior to CollaGenex's registration

16   of the Restoraderm trademark, then Mr. Skold has prior rights

17   or what the law calls priority in the trademark.  The burden

18   is on Mr. Skold to prove that he had priority in the

19   trademark which places his ownership rights ahead of those of

20   CollaGenex.

21             To establish that he owned the common law trademark

22   before entering into written agreements with CollaGenex, Mr.

23   Skold must demonstrate that he used the mark in commerce,

24   that his use was continuous, and the use was sufficient to

25   identify or distinguish the trademark in an appropriate

1   sector in which the product is marketed.

2          The Court has already concluded that the 2004

3   agreement cancels all prior agreements, specifically

4   referring to the 2002 agreement with respect to the subject

5   matter there, i.e. the 2004 agreement, and thereof, i.e. the

6   2002 agreement.  This provision has only one reasonable

7   construction:  any claimed ownership of the trademark

8   defendants had through the 2002 agreement was voided by the

9   2004 agreement.

10          Although I have instructed you that you may not

11   consider the 2002 agreement as evidence of the parties'

12   rights, you are permitted to consider the 2002 agreement for

13   other purposes, including as evidence as to whether the

14   parties understood that Mr. Skold had established a valid and

15   protectable trademark in the Restoraderm name.

16          The 2004 agreement between Mr. Skold and CollaGenex

17   provided that upon termination of the agreement CollaGenex

18   would return to Mr. Skold what are described as the purchased

19   assets.

20          The term "purchased assets" was defined in Section

21   2.1 of the agreement as; one, the Restoraderm intellectual

22   property; two, the books and records relating to the

23   Restoraderm intellectual property; three, all rights and

24   claims of Mr. Skold against third parties relating to the

25   purchased assets; and, four, all goodwill, if any, relating

1   to the foregoing items.  You must decide whether the

2   trademark was one of the purchased assets that Mr. Skold and

3   CollaGenex intended to transfer under the agreement.

4          In reaching this decision, you must consider the

5   language of the agreement, giving the words their ordinary

6   meaning.  If you find that the language is clear and

7   unambiguous one way or the other, then that ends your

8   inquiry.

9          A contract is considered clear and unambiguous if it

10  is reasonably capable of only one interpretation.  However,

11  if the words of the contract are capable of more than one

12  objectively reasonable interpretation, then they are

13  considered ambiguous.  In that case, you may consider what we

14  call extrinsic evidence.  Extrinsic evidence is the other

15  evidence, the testimony of the witnesses and the documents

16  admitted into evidence that the parties contend shed light on

17  the intentions that CollaGenex and Mr. Skold had when they

18  signed the agreement.

19         The paramount goal of contract interpretation is to

20  determine the intent of the parties.

21         You must consider whether Galderma's use of the

22  trademark is likely to cause confusion about the source of

23  either Mr. Skold or Galderma's goods.  In other words, is it

24  likely that people will think that Mr. Skold's products were

25  made by or are associated with Galderma or vice versa.  When

1    I say people, that includes both the companies that Mr. Skold

2    claims he marketed his product to, as well as individual

3    purchasers buying Cetaphil Restoraderm off the supermarket or

4    pharmacy shelves.

5         I will suggest to you some factors you should

6    consider in deciding this issue.  The presence or absence of

7    any particular factor that I suggest should not necessarily

8    resolve whether there was a likelihood of confusion, because

9    you must consider all relevant evidence in determining the

10   issue.

11        As you consider the likelihood of confusion, you

12   should examine the following factors.  The degree of

13   similarity between Mr. Skold's mark and the alleged

14   infringing mark.  In this case, the marks are identical.

15        The strength of the mark; in other words, because of

16   advertising or marketing, or because of the party's relative

17   size or because the trademark is inherently distinctive, is

18   the buyer more likely when it sees the trademark to identify

19   it with one party or the other.  If the mark is strong, this

20   factor weighs in favor of a likelihood of confusion; if it is

21   weak, then this factor weighs against a likelihood of

22   confusion.

23        The price of the goods and other factors that

24   indicate the care and attention expected of buyers when

25   making a purchase.  Inexpensive goods require consumers to

Charge of the Court                          47

1    exercise less care in their selection than expensive ones,

2    increasing the likelihood of confusion.  Sophisticated

3    buyers, on the other hand, are less likely to be confused by

4    similarities in the mark.

5            The length of time, if any, that Galderma has used

6    the mark without evidence of actual confusion arriving; the

7    intent of the defendants in adopting the trademark; whether

8    the goods, though not competing, are marketed through the

9    same channels of trade and advertised through the same

10   channels of trade, and advertised through the same media; the

11   extent to which the targets of the parties' sales efforts are

12   the same; the relationship of the goods in the minds of the

13   public because of the similarity of function; and any other

14   facts suggesting that the consuming public might expect Skold

15   or Galderma to manufacture both products or expect one to

16   manufacture a product in the other's market.

17           You need not give each of these factors the same

18   weight.  In fact, you may find that some of the factors

19   simply do not apply to the facts of this case and therefore

20   choose to afford them no weight at all.

21           Moving now to the claim of false advertising.  To

22   establish a claim for false advertising, Mr. Skold must prove

23   five elements:  Defendants have made a false or misleading

24   statement as to his product or as to another person's

25   product; two, there is actual deception or at least a

1  tendency to deceive a substantial portion of the intended

2  audience; three, the deception is material in that it is

3  likely to influence purchasing decisions; four, the

4  advertised goods traveled in interstate commerce; and, five,

5  there is a likelihood of injury to Mr. Skold in terms of

6  declining sales, loss of goodwill or otherwise.

7          Turning to breach of contract, the elements of a

8  breach-of-contract claim.  To prevail on a claim for breach

9  of contract, Mr. Skold must show; one, the existence of a

10  contract, including its essential terms; two, a breach by

11  defendants of a duty imposed by the contract; and, three,

12  damages resulting from the breach of the contract.

13          A breach of contract occurs when a party to the

14  contract fails to perform any contractual duty of immediate

15  performance or violates an obligation, engagement or duty,

16  and that breach is material.

17          A breach does not have to be defined in a contract.

18  Not every nonperformance, however, is to be considered a

19  breach of the contract.  If you find that the nonperformance

20  was immaterial and thus the contract was substantially

21  performed, you must also find that a breach of the contract

22  has not occurred.

23          In order to prevail on his claim for nonperformance,

24  Mr. Skold must prove his own performance and must prove a

25  breach by the other party.  In this case Mr. Skold alleges

1    that Galderma had an affirmative obligation to transfer the

2    Restoraderm trademark to him and by failing to do so has

3    breached the contract.

4           Turning now to unjust enrichment.  To prevail on a

5    claim of unjust enrichment, Mr. Skold must prove that; one,

6    he provided a benefit to defendants; two, defendants

7    appreciated such a benefit; and, three, defendants accepted

8    and retained such benefit under circumstances where it would

9    be inequitable for defendants to do so.

10          Defendants contend that one of Mr. Skold's claim,

11   the claim for breach of contract, is barred by the statute of

12   limitations.  In general, a plaintiff must file such a claim

13   within four years of the date from on which the cause of

14   action accrued.  A claim for breach of contract accrues when

15   the contract is breached.  The defendants have the burden to

16   prove their statute of limitations defense by a preponderance

17   of the evidence.

18          In deciding whether the statute of limitations bars

19   any of Mr. Skold's claims, you must also determine whether

20   the facts as you find them support the application of an

21   exception to the general rule.  An exception to the normal

22   statute of limitations applies if you find that Mr. Skold's

23   lawsuit was filed within four years of the date on which Mr.

24   Skold knew or could have reasonably discovered his injury.

25          A defendant may be estopped from asserting a statute

1   of limitations defense if through fraud, deception or

2   concealment of facts a defendant lulls an injured person or

3   his representatives into a sense of security so that such

4   persons vigilance is relaxed.  It is the plaintiff's duty to

5   use reasonable diligence to properly inform himself of the

6   facts and circumstances of the injury.

7          In this case suit was filed on September the 15th,

8   2014.  You must decide if the claim for breach of contract

9   was filed within four years of the date from which plaintiff

10  knew or should have reasonably discovered his injury in this

11  case.

12         If you find that plaintiff has proven his claims for

13  trademark infringement, false advertising, unfair

14  competition, or unjust enrichment, you may then consider

15  whether the plaintiff is entitled to a remedy known as

16  disgorgement of profits.

17         To recover disgorgement of profits, Mr. Skold has to

18  prove the amount of Galderma's profits attributable to the

19  use of the Restoraderm trademark.  To do that, Mr. Skold had

20  the burden of proving the amount of gross revenues that

21  Galderma received as a result of its use of the Restoraderm

22  trademark.  Galderma then have the burden of proving the

23  amount of expenses that should be deducted from the gross

24  revenue number.  Profits are determined by deducting all

25  expenses from gross revenues.

1          In the alternative, if you find that Mr. Skold has

2     been unable to establish the amount of the defendants' gross

3     revenue, but is nonetheless entitled to some form of damages,

4     you may determine the amount of a fair royalty for the use of

5     the trademark.  A reasonable royalty is the amount of money

6     that plaintiff and Galderma would have agreed upon if they

7     had negotiated the terms of a royalty before Galderma began

8     using the Restoraderm trademark on its Cetaphil products.

9          If you find that the conduct of the defendants was

10    outrageous, you may award punitive damages as well as any

11    compensatory damages in order to punish the defendants for

12    their conduct and to deter the defendants and others from

13    committing similar acts.

14          A person's conduct is outrageous when it is

15    malicious, wanton, willful or oppressive, or shows reckless

16    indifference to the interests of others.

17          If you decide that the plaintiff is entitled to an

18    award of punitive damages, it is your job to fix the amount

19    of such damages; in doing so, you may consider any or all of

20    the following factors.  The character of the defendants'

21    acts; the nature and extent of the harm to the plaintiff that

22    the defendant caused or intended to cause.  In this regard

23    you may include the plaintiff's trouble and expense in

24    seeking to protect his interests in legal proceedings and in

25    this suit.  The wealth of the defendant insofar as it is

1   relevant in fixing an amount that will punish it and deter it

2   and others from like conduct in the future.

3          It is not necessary that you award compensatory

4   damages to the plaintiff in order to assess punitive damages

5   against the defendant, as long as you find in favor of the

6   plaintiff and against the defendant on the question of

7   liability.

8          The amount of punitive damages awarded must not be

9   the result of passion or prejudice against the defendant on

10  the part -- or defendants on the part of the jury.  The sole

11  purpose of punitive damages is to punish the defendants'

12  outrageous conduct and to deter the defendants and others

13  from similar acts.

14         So that is the end of the substantive portions of

15  the jury instructions.  I'm now going to tell you how to

16  deliberate.

17         When you retire to the jury room to deliberate, you

18  should select one member of the jury as your foreperson.

19  That person will preside over the deliberations and speak for

20  you here in open court.

21         You have two main duties as jurors:  the first one

22  is to decide what the facts are from the evidence that you

23  saw and heard here in court.  Deciding what the facts are is

24  your job, not mine, and nothing that I have said or done

25  during this trial was meant to influence your decision about

1    the facts in any way.  Your second duty is to take the law

2    that I have given you, apply it to the facts and decide if

3    under the appropriate burden of proof the parties have

4    established their claims.

5          It's my job to instruct you about the law and you

6    are bound by the oath you took at the beginning of the trial

7    to follow the instructions that I give to you even if you

8    personally disagree with them.  This includes the

9    instructions that I gave you before and during trial, and

10   these instructions as well.  All the instructions are

11   important and you should consider them together as a whole.

12         Perform these duties fairly.  Do not let any bias,

13   sympathy or prejudice that you may feel toward one side or

14   the other influence your decision in any way.

15         As jurors, you have a duty to consult with each

16   other and to deliberate with the intention of reaching a

17   verdict.  Each of you must decide the case for yourself, but

18   only after a full and impartial consideration of all of the

19   evidence with your fellow jurors.  Listen to each other

20   carefully.  In the course of your deliberations, you should

21   feel free to reexamine your own views and to change your

22   opinion based upon the evidence, but you should not give up

23   your honest convictions about the evidence just because of

24   the opinions of your fellow jurors, nor should you change

25   your mind just for the purpose of obtaining enough votes for

Charge of the Court                54

1    a verdict.

2           When you start deliberating, do not talk to the jury

3    officer, and in that case it's Mr. Mani.  Don't talk to me or

4    to anyone; only talk to each other about the case.

5           During your deliberations you must not communicate

6    with or provide any information to anyone by any means about

7    this case.  You may not use -- and you've heard this before

8    -- electronic device or media such as cell phone, Smartphone,

9    Blackberrys, iPhones, computers of any kind, the Internet,

10   any Internet services, or any text or instant messaging

11   services like Twitter, or any Internet chat room, blog, Web

12   site or social networking services such as Facebook, MySpace,

13   LinkedIn or YouTube to communicate to anyone any information

14   about this case or to conduct any research about this case

15   until I accept your verdict.

16          You may not use these electronic means to

17   investigate or communicate about this case because it's

18   important that you decide this case based solely on the

19   evidence presented in the courtroom.  Information on the

20   Internet or available through social media might be wrong,

21   incomplete or inaccurate.  Information that you might see on

22   the Internet or on social media has not been admitted into

23   evidence and the parties have not had a chance to discuss it

24   with you.  You should not seek or obtain such information and

25   it must not influence your decision in this case.

1        If you have any questions or messages for me, you

2   must write them down on a piece of paper, have the foreperson

3   sign them, and give them to the jury officer.  The officer

4   will give them to me and I will respond as soon as I can.  I

5   may have to talk to the lawyers about what you have asked, so

6   it may take some time to get back to you.

7        One more thing about messages.  Never write down or

8   tell anyone how you stand on your votes.  For example, do not

9   write down or tell anyone that a certain number is voting one

10  way or the other.  Your vote should stay secret until you are

11  finished.

12       Your verdict must represent the considered judgment

13  of each juror.  In order for you as a jury to return a

14  verdict each juror must agree to the verdict; your verdict

15  must be unanimous.

16       A form of verdict has been prepared for you, it has

17  a series of questions for you to answer.  You will take this

18  form to the jury room and, when you have reached a unanimous

19  verdict as to your verdict, you will fill it in and have your

20  foreperson date and sign the form.  You will then return to

21  the courtroom and your foreperson will give your verdict.

22       Unless I direct you otherwise, do not reveal your

23  answers until you are discharged.  After you have reached a

24  verdict, you are not required to talk with anyone about the

25  case until -- unless I order you to do so.

1        Once again, I want to remind you that nothing about

2   my instructions and nothing about the form of verdict is

3   intended to suggest or convey in any way or manner what I

4   think your verdict should be.  It is your sole and exclusive

5   duty and responsibility to determine the verdict.

6        Mr. Mani, have you got the verdict form?  Okay.  Now

7   if you could take the jury back into the --

8        THE DEPUTY CLERK:  (Indiscernible) --

9        THE COURT:  Ah, yes.  Alternate No. 2, if you could

10  remain.  Everyone else follow Mr. Mani back into the jury

11  room.

12        THE DEPUTY CLERK:  All rise.

13        (Jury out at 10:28 o'clock a.m.)

14        THE COURT:  I'm trying to get the pronunciation of

15  your name -- Jakolski (ph)?

16        ALTERNATE JUROR NO. 2:  Jaholski (ph).

17        THE COURT:  Jaholski?  Almost there.  Ms. Jaholski,

18  I wanted to thank you very much for your service during the

19  trial.  You've paid a huge amount of attention, very focused,

20  and I appreciate you doing that, particularly because you

21  knew you were an alternate.

22        You may think that I'm about to release you, but I'm

23  not and here's why.  There is a small possibility that

24  something may occur such that one of the jurors who've gone

25  back into the jury room may have to be excused.  In that

1    case, I will need your services.  So what I'm asking you to

2    do is until at least 5:00 o'clock today you remain within the

3    city.  Now, where do you live?

4             ALTERNATE JUROR NO. 2:  Easton.

5             THE COURT:  Oh, Easton.  Okay.  Mr. Mani has your

6    telephone number.  If a verdict is reached before 5:00, he

7    will call you and then you will be released.  If a verdict is

8    not reached before 5:00 and the jurors have to come back on

9    Tuesday, I will not require you to come back into

10   Philadelphia.  However, you should be prepared if you get a

11   telephone call to come back into Philadelphia.  I know that

12   could cause -- you know, it's a little burdensome.  I think

13   it's a remote possibility, but I want to just forewarn you

14   that that might be a possibility.  Okay?

15            Thank you very much.

16            THE DEPUTY CLERK:  All rise.

17            (Alternate Juror No. 2 out at 10:30 o'clock a.m.)

18            THE COURT:  Okay, have a seat.  So have you sorted

19   out your document issues?

20            MR. LIPUMA:  We were just waiting.  Our technical

21   consultant needs to print out a couple of copies of things,

22   and then we'll put them in the book and they'll be ready to

23   go.  He's supposed to be here any time, your Honor.

24            THE COURT:  Okay.  When you get them, give them to

25   Mr. Mani.  Make sure that --

58

1        MR. MESCHES:  I'm sorry, your Honor, when -- I'd

2   like to just review the books again when he puts those in

3   there --

4        THE COURT:  Yes.

5        MR. MESCHES:  -- to ensure that they're --

6        THE COURT:  I am assuming that you will both have

7   reviewed it extensively and you will have both agreed to the

8   documents that are in there.  And once you're ready and

9   you're done with that, give it to Mr. Mani, he'll take it

10  back.  I'm sure they've got some organizational issues to

11  deal with first.

12       Anything else?

13       MR. LIPUMA:  No, your Honor.

14       THE COURT:  Okay.  I think my policies and

15  procedures say that you have to be accessible within ten

16  minutes.  So Mr. Mani has all your telephone numbers,

17  correct?

18       MR. LIPUMA:  We'll make sure he does, your Honor.

19       THE COURT:  Okay.  In essence, you can stay in the

20  courtroom, if you want, you can go back to your offices if

21  they are -- you know, you're within ten minutes of getting

22  back into the courtroom.  Remember you have to get through

23  security as well, so that really means five minutes to get

24  back to the courthouse.

25       If I get any notes from the jurors, I'll contact you

59

1   immediately, and we'll have a discussion about those notes

2   before I respond to them.

3           And we're just in for a little wait -- either a long

4   wait or a little wait, who knows.  Okay.

5           MR. CLARK:  Thank you, your Honor.

6           MR. LIPUMA:  Thank you, your Honor.

7           (Court in recess; 10:32 to 3:36 o'clock p.m.)

8           THE COURT:  Have a seat.

9           So I have a note from the jury:  "What are the terms

10  for determining unjust enrichment?"

11          What I plan to do with your agreement is to go to

12  the jury instructions and read to them the unjust enrichment

13  charge again.  Does that make sense?

14          MR. LIPUMA:  Yes, your Honor.

15          MR. MESCHES:  That's fine with us, your Honor.

16          THE COURT:  Okay.  So let's make sure we agree on

17  what that is.

18          (Pause.)

19          THE COURT:  I'm just looking through.  If anyone

20  knows which one it is --

21          MR. LIPUMA:  I believe it's 18, your Honor.

22          THE COURT:  18?  Okay.

23          (Pause.)

24          THE COURT:  Okay.  So it's a very short one.

25          Okay, bring them in.

60

```
1              (Jury in at 3:38 o'clock p.m.)

2              THE COURT:  So could the foreperson identify

3    themselves?

4              So I have a note which -- it says, "What are the

5    terms of determining unjust enrichment?"

6              THE JURY FOREPERSON:  Yes.  We thought -- was there

7    criteria that we were instructed on this morning in

8    determining --

9              THE COURT:  Yes, but I just wanted to make sure that

10   that was your signature.

11             THE JURY FOREPERSON:  Yes.

12             THE COURT:  Okay.  Have a seat.

13             So I've talked to the lawyers and what I'm going to

14   do is reveal -- read to you the elements of an unjust

15   enrichment.

16             To prevail on a claim of unjust enrichment, Mr.

17   Skold must prove that; one, he provided a benefit to

18   defendants; two, defendants appreciated such a benefit; and,

19   three, defendants accepted and retained such benefit under

20   circumstances where it would be inequitable for defendants to

21   do so.

22             Okay?  You can return to your deliberations.

23             (Jury out at 3:39 o'clock p.m.)

24             THE COURT:  Okay?  More waiting.

25             ALL:  Thank you, your Honor.
```

1              (Court in recess; 3:39 to 4:49 o'clock p.m.)

2              THE DEPUTY CLERK:  All rise.

3              THE COURT:  Have a seat.

4         So if the jurors are to deliberate beyond 5:00, I

5    have to do things like notify the U.S. Marshals, make sure

6    the lights are kept on, et cetera.  So I asked Mr. Mani to

7    ask the jurors whether they would like me to do that.  They

8    have decided that they would like to come back on Tuesday.

9    Obviously, they have more deliberations to do.

10             So rather than tell the U.S. Marshals to stay and

11   keep the lights, we're going to bring them in and excuse them

12   for the weekend, and we'll come back at 9 o'clock on Tuesday

13   morning.

14             MR. MESCHES:  Fair enough.

15             THE COURT:  Okay?

16             (Discussion held off the record.)

17             THE COURT:  They don't want to come out?

18             THE DEPUTY CLERK:  They're re-weighing the option of

19   staying through the night.

20             THE COURT:  Oh, they're re-weighing the option of

21   staying through the night.  So I think -- how long is this

22   going to -- re-weighing going to take?

23             THE DEPUTY CLERK:  I'm going to go ask them again

24   right now.

25             THE COURT:  Okay.

62

1          (Discussion held off the record.)

2          (Jury in at 4:49 o'clock p.m.)

3          THE COURT:  So, members of the jury, I understand

4    that you are still deliberating and that you have some way to

5    go.  The choice I think provided to you by Mr. Mani was to

6    stay tonight and continue to deliberate until you reached a

7    conclusion or to come back on Tuesday.  And as I understand

8    it, you have decided to come back on Tuesday?

9          You're the foreperson, so you speak on behalf of the

10   jury.

11         THE JURY FOREPERSON:  Yes, your Honor.

12         THE COURT:  Okay.  Well, I appreciate the very hard

13   effort that I know you have been doing all this afternoon and

14   appreciate your interest in coming back on Tuesday.

15         So in the meantime the admonitions continue to

16   apply.  I think it's going to be particularly difficult over

17   the July the 4th weekend, because you'll be with family and

18   they'll want to know, but you can tell them that Judge

19   Beetlestone has told you -- has ordered you not to talk about

20   the case.

21         Once you leave the jury room, do not talk about the

22   case even among yourselves.  Deliberations must be all of you

23   talking together.  So once you as a group split up and if you

24   happen to be in the elevator together, don't talk to each

25   other individually about the case, it has to be together.

1        In the meantime, enjoy the July 4th weekend.  Have a

2   great vacation.

3        THE DEPUTY CLERK:  All rise.

4        (Jury out at 4:50 o'clock p.m.)

5        THE COURT:  Okay.  So you're released.

6        MR. LIPUMA:  See you Tuesday.

7        THE COURT:  Yeah, Mr. Skold, sorry, can't go back

8   home yet, neither can they.

9        Are you staying over the weekend in Philly or are

10  you going back to New York?

11       UNIDENTIFIED SPEAKER:  We haven't thought about that

12  to this point, your Honor --

13       (Laughter.)

14       UNIDENTIFIED SPEAKER:  -- so we'll have to meditate

15  on that one.

16       THE COURT:  Have to figure that one out?

17       UNIDENTIFIED SPEAKER:  Thank you.

18       THE COURT:  Okay.  So I'll see you -- you know,

19  they're going to show up at 9:00.  As long as you're within

20  ten minutes of here, then I think that's fine.  So I'm not

21  sure you have to camp out here, but if you want to camp out,

22  it's available.  Okay?

23       ALL:  Thank you, your Honor.

24       (Proceedings concluded at 4:52 o'clock p.m.)

I N D E X

PAGE

CHARGE OF THE COURT                                          28

* * *

<u>CERTIFICATION</u>

I hereby certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


s:/Geraldine C. Laws, CET          Date 07/25/16
Laws Transcription Service