**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **THOMAS SKOLD,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **GALDERMA LABORATORIES, L.P., et al.,** | **NO.  14-5280** |
| **Defendants.** | |

## OPINION

This case arises from a dispute over a skincare technology and trademark known as "Restoraderm."  Plaintiff entered into two successive agreements with CollaGenex Pharmaceuticals, Inc. ("CollaGenex") to commercialize a product line using his Restoraderm technology.   CollaGenex was subsequently acquired by Galderma Inc.,[1] which decided not to pursue the development agreement with Plaintiff.  Galderma did, however, utilize the Restoraderm trade name on its own line of eczema relief products – a skincare line named "Cetaphil Restoraderm" that did not contain the technology developed by Plaintiff.  Plaintiff sued Defendants for trademark infringement, false advertising, and unfair competition under the Lanham Act, and for breach of contract and unjust enrichment under Pennsylvania state law.

---

[1] Defendant Galderma S.A. ("S.A." or "Galderma S.A.") is a skincare company headquartered in Switzerland. Defendant Galderma Laboratories, Inc. ("Inc." or "Galderma Inc.") is a United States-based subsidiary of Galderma S.A.  Defendant Galderma Laboratories, L.P. ("L.P." or "Galderma L.P.") is a Texas-based limited partnership owned by Inc. that markets and sells Cetaphil Restoraderm products in the United States.  L.P., Inc., and S.A. (collectively, "Galderma" or "the Galderma Defendants") are all involved in the research, development, marketing, and sales of pharmaceutical and therapeutic skincare products.  Prior to 2014, Galderma S.A. was owned partially by L'Oreal and partially by Nestlé.  In 2014, Nestlé bought L'Oreal's share in Galderma S.A. and created a new Galderma parent company: Defendant Nestlé Skin Health S.A. ("Nestlé S.A.").

# I.    PROCEDURAL POSTURE

After a seven-day jury trial in June and July 2016, the jury entered a verdict as follows:

Ownership of the Restoraderm Trademark

1. Did Plaintiff establish that he is the rightful owner of the Restoraderm trademark? Yes.

Likelihood of Confusion

2. Is it likely that the relevant market for purchasers of the products offered by either Plaintiff or Galderma will be confused as to their source? No.

False Advertising

3(a). Is use of the term "Restoraderm" on Galderma's Cetaphil products false or misleading? Yes.

3(b). Does use of the term "Restoraderm" on Galderma's Cetaphil products deceive, or have the capacity to deceive a substantial segment of customers in the marketplace for these products? No.[2]

Contract Claim

4. Did Plaintiff establish that, under the 2004 Agreement, the Defendants were required to transfer the Restoraderm trademark to Mr. Sköld following the termination of the 2004 Agreement? Yes.

5. Did Plaintiff know or should he have reasonably known before September 14, 2010 that Defendants did not intend to transfer the Restoraderm trademark to Plaintiff? Yes.

Unjust Enrichment

6. Were Defendants unjustly enriched by the use of the Restoraderm trademark? Yes.

The jury awarded $560,000 as a reasonable royalty for Galderma's use of the

Restoraderm trademark, $58,800 as the amount of profits earned by Defendants attributable to

the use of the Restoraderm trademark, and $550,000 in punitive damages.

---

[2] The verdict form directed the jury to proceed to Question 4 if the answer to Question 3(b) was "yes." Accordingly, the jury did not answer Questions 3(c) ("Does use of the term "Restoraderm" on Galderma's Cetaphil products have a material effect on customer purchasing decisions?") or 3(d) ("Is Plaintiff injured or likely to be injured in terms of declining sales, loss of goodwill, or otherwise as a result of the use of the term "Restoraderm" on Galderma's Cetaphil products?").

Following the jury verdict, Plaintiff moved the Court to enter a proposed judgment awarding him restitutionary damages ($58,800), injunctive relief, and declaratory relief.[3] The Court denied Plaintiff's motion and entered judgment in accordance with the jury verdict (ECF No. 185). The judgment dismissed with prejudice Plaintiff's Lanham Act claims for trademark infringement, false advertising, and unfair competition, and also dismissed with prejudice his state law claims for unfair competition and breach of contract. The Court granted judgment for Plaintiff on his unjust enrichment claim in the amount of $58,800 against Defendants Galderma L.P., Galderma S.A., and Nestlé S.A.[4]

The Court denied with prejudice Plaintiff's request for permanent injunctive relief and declaratory relief on his Lanham Act claims because those claims were rejected by the jury. *See Ciba-Geigy Corp. v. Bolar Pharm. Co., Inc.*, 747 F.2d 844, 850 (3d Cir. 1984) (holding that permanent injunctive relief requires actual success on the merits); *Scott v. Horn*, No. 97-1448, 1998 WL 57671, at *10 (E.D. Pa. Feb. 9, 1998) (holding that declaratory relief requires success on the merits). Because the declaratory relief Plaintiff requested did not align with the elements of unjust enrichment, the Court also rejected that request. The Court attached the jury verdict sheet to the judgment.

The Court also ruled that Plaintiff was entitled to recover costs against Defendants. On March 29, 2017, both parties filed the instant post-trial motions.

---

[3] Plaintiff did not seek recovery of the jury's $560,000 award for reasonable royalties, acknowledging that this award represented compensatory damages, which are not the proper remedy for unjust enrichment. *See, e.g.*, *De Lage Landen Operational Servs., LLC v. Third Pillar Sys., LLC*, No 9-2439, 2011 WL 1627899, at *3 (E.D. Pa. Apr. 28, 2011). Nor did Plaintiff seek to recover the jury's award of $550,000 in punitive damages, since Pennsylvania law bars such damages in unjust enrichment cases. *See, e.g.*, *Williamsburg Commons Condo. Ass'n v. State Farm Fire & Cas. Co.*, 907 F.Supp.2d 673, 680 n.7 (E.D. Pa. 2012); *Alfamodess Logistics, LLC v. Catalent Pharma Solutions, LLC*, 2014 WL 4545763, at *29 n.244 (E.D. Pa. Sept. 12, 2014).

[4] The Court did not grant judgment for Plaintiff on unjust enrichment against Galderma Inc., having previously ruled that the existence of the 2004 Agreement precluded that claim against Inc. as CollaGenex's successor-in-interest. *Sköld v. Galderma Labs., L.P.*, 99 F.Supp.3d 585, 599 (E.D. Pa. 2015).

Presently before the Court are cross-motions for post-trial relief.  Defendants move the Court to set aside the jury's verdict on unjust enrichment under Federal Rule of Civil Procedure 50(b).  Plaintiff moves the Court to set aside the verdict under Rule 50(b) or, in the alternative, to order a new trial under Federal Rule of Civil Procedure 59.  Because the Court finds no grounds to disturb the jury's verdict, both parties' motions are denied.

## II.    STANDARDS OF LAW

### A.    <u>Motion for Judgment as a Matter of Law</u>

The grant of a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) after trial is warranted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  In considering the evidence, "the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version."  *Id.*  "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability."  *Id.*  At bottom, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Id*. (quotation omitted).

### B.    <u>Motion for New Trial Pursuant to Rule 59</u>

Concurrent with his motion for judgment as a matter of law, Plaintiff moves, in the alternative, for a new trial.  "[E]ven when judgment as a matter of law is inappropriate," a new trial may be granted pursuant to Federal Rule of Civil Procedure 59.  *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir. 1995).  Rule 59(a)(1)(A) provides a court with

the discretion to grant a new trial after a jury verdict "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A motion for new trial may be based, *inter alia*, on grounds that a verdict is against the weight of the evidence, that an award of damages is excessive or inadequate, or because, for other reasons, the trial was not fair to the moving party. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

A district court generally has wide discretion in the application of Rule 59, but when the proffered basis for a new trial is that "the verdict is contrary to the great weight of the evidence," the court's discretion is narrowed to cases "where a miscarriage of justice would result if the verdict were to stand." *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001) (internal quotation omitted). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991).

## III. FACTS

Plaintiff Thomas Sköld is a Swedish entrepreneur whose work focuses on skincare technology. In the mid-1990s, he worked at Ponsus Pharma, a small Swedish pharmaceuticals company. In the summer of 2001, he left Ponsus and began pursuing a skincare technology he had developed and which he termed "Restoraderm." Restoraderm was both a topical moisturizer and a dermal delivery technology, *i.e.* a vehicle that helps the skin absorb other active ingredients.

In 2001, Plaintiff set out to find a business partner interested in commercially developing products using Restoraderm technology. He met and had conference calls with several

pharmaceutical companies in the fall of 2001 – including Johnson & Johnson, Allergan, and Medicis Pharmaceutical Corp. – and discussed collaborating to develop his technology for mass consumption. In January 2002, he attended the American Association of Dermatology conference in the Caribbean, at which he presented and distributed literature on his Restoraderm technology to potential business partners.

One such potential business partner was CollaGenex. After Plaintiff presented CollaGenex with information about his Restoraderm technology, the parties agreed to jointly develop it into a product line. On February 11, 2002, Plaintiff and CollaGenex signed a Co-operation, Development, and Licensing Agreement (the "2002 Agreement"). The 2002 Agreement required CollaGenex to develop at least three products based on Restoraderm technology, while Plaintiff agreed to act as a consultant to CollaGenex throughout the development process. The Agreement also provided that all Restoraderm trademarks would be the exclusive property of CollaGenex and would be registered in CollaGenex's sole name.[5] The 2002 Agreement contained no provision governing either party's obligations in the event of its termination.

Following the 2002 Agreement, Plaintiff and CollaGenex worked together to develop and promote products based on Restoraderm technology. CollaGenex filed a trademark application for the Restoraderm mark with the United States Patent and Trademark Office ("P.T.O.") on February 28, 2002. The application was granted and the trademark registered in CollaGenex's name on August 16, 2005. Meanwhile, Plaintiff acted as CollaGenex's full-time consultant,

---

[5] Section 4.2.1 of the 2002 Agreement provides: "All trade marks applied for or registered (including 'Restoraderm') shall be in the sole name of CollaGenex and be the exclusive property of CollaGenex during the Term and thereafter . . . ." For further discussion, *see Sköld v. Galderma Labs., L.P.*, No. 14-5280 (E.D. Pa. Jan. 4, 2016).

traveling from Sweden to the United States to promote Restoraderm, buying ingredients for samples, and hiring laboratories to undertake product testing.

In late 2003, CollaGenex suggested to Plaintiff that they enter into a new agreement. After a few months of negotiations, on August 19, 2004 they entered into an Asset Purchase and Product Development Agreement (the "2004 Agreement"). The 2004 Agreement explicitly terminated the 2002 Agreement.[6] It provided that CollaGenex acquired various assets from Plaintiff – defined in § 2.1 ("Purchased Assets")[7] – which included the Restoraderm intellectual property and its related "goodwill." The "Purchased Assets" provision did not explicitly include the Restoraderm trademark, and the parties dispute whether the trademark was covered under "goodwill." The terms of the Agreement also provided that Plaintiff would receive a consulting fee, plus a five percent royalty on Restoraderm products that resulted from the Agreement. Unlike the 2002 Agreement, the 2004 Agreement contained a voluntary termination clause permitting CollaGenex to terminate the Agreement,[8] which would also trigger the return of all

---

[6] Section 9.12 of the 2004 Agreement provides: "This Agreement hereby, together with the Schedules and Exhibits, constitute and contain the complete, final and exclusive understanding and agreement of the Parties and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements (including the Original Agreement) whether oral or written, between the Parties respecting the subject matter hereof and thereof . . . ." *See Sköld v. Galderma Labs., L.P.*, No. 14-5280 (E.D. Pa. Jan. 4, 2016).

[7] Section 2.1 of the 2004 Agreement defines "Purchased Assets" as:
    (a) The Restoraderm Intellectual Property;
    (b) The Book and Records relating to the Restoraderm Intellectual Property;
    (c) All rights and claims of Sköld and its Affiliates against Third Parties relating to the Purchased Assets, choate or inchoate, known or unknown, contingent or otherwise; and
    (d) All goodwill, if any, relating to the foregoing.

[8] Section 8.2 of the 2004 Agreement permitted CollaGenex to terminate the Agreement "at any time after March 31, 2007."

"Purchased Assets" to Plaintiff.[9]  The 2004 Agreement explicitly bound the original parties'

successors and assigns.[10]

Subsequent to the 2004 Agreement, Plaintiff and CollaGenex continued their product

development efforts.  They created more product samples, which they sent to other

pharmaceutical companies – including Galderma – that expressed an interest in using

Restoraderm technology as a dermal delivery vehicle for their own skincare products.  By 2006,

five products based on Restoraderm technology were at an advanced stage of development.

Around this time, however, CollaGenex ran into financial difficulties, and in 2007, it

ceased pursuing development of the Restoraderm technology.  In April 2008, Galderma Inc.

acquired CollaGenex.  As a result of that acquisition, Galderma Inc. became CollaGenex's

successor-in-interest under the 2004 Agreement with Plaintiff.  Shortly after the acquisition,

Plaintiff contacted Art Clapp, Vice President of Business Development at Galderma L.P., to

inquire as to Galderma's plans for developing Restoraderm products.  Clapp advised Plaintiff

that Galderma needed a few months to evaluate the Restoraderm technology before deciding

how to proceed.

Plaintiff continued to communicate with Galderma throughout 2008 in an effort to assist

with the evaluation.  In August 2008, he visited Galderma's research and development facility in

France to provide more information about the Restoraderm technology; in December 2008, he

visited Galderma's offices in Fort Worth, Texas.  Neither visit produced a firm answer as to

whether Galderma had decided to pursue developing the Restoraderm technology.  When

---

[9] Section 8.5(b)(iii) of the 2004 Agreement provided that in the event of a voluntary termination by CollaGenex, "CollaGenex shall transfer to Sköld the Purchased Assets and Additional Records relating to such terminated Products."

[10] Section 9.2 of the 2004 Agreement provides: "This Agreement shall be binding upon, and subject to the terms of the foregoing sentence, inure to the benefit of the Parties hereto, their permitted successors, legal representatives and assigns."

Plaintiff followed up with Clapp in February 2009, Clapp assured him that Galderma would get back to him shortly.

In the summer of 2009, Plaintiff heard from a business associate that Galderma intended to use only the Restoraderm name – not the technology itself – and that it would be using the name on its own products. Plaintiff emailed Quintin Cassady, Vice President and General Counsel of Galderma L.P., seeking clarification. In a telephone call, Cassady and other Galderma representatives assured Plaintiff that the rumor was false. In June 2009, Cassady emailed Plaintiff to reaffirm that the 2004 Agreement continued to govern Galderma's relationship with Plaintiff, and Galderma saw no need to replace that Agreement. Cassady also stated that he intended to be more involved in the Restoraderm project going forward.

At some point in the first quarter of 2009, however, Galderma decided to use the Restoraderm name on a Galderma product. This decision was made during a meeting at the Fort Worth office between Humberto Antunes (Galderma's C.E.O.), Pierre Libman (Galderma's C.F.O.), and Cassady. According to Defendants, this decision was made because Galderma believed it owned the Restoraderm trademark, and because it wanted to derive value from its acquisition of CollaGenex. Defendants maintain that, when this decision was made, there was still a possibility that the Restoraderm trademark would be utilized on products containing Plaintiff's technology.

In the fall of 2009, Galderma's Product Portfolio Review Board ("PPRB") recommended that the company no longer pursue Plaintiff's Restoraderm technology. Defendants contend that this decision was made based on the technology's poor performance when subjected to testing in the summer of 2009.

In October 2009, Cassady contacted Plaintiff to let him know that Galderma had made a decision, and that Chris De Bruyne – Galderma's Licensing and Alliance Management Director – would arrange an in-person meeting to deliver the news. That meeting took place in Stockholm on November 29, 2009. De Bruyne provided Plaintiff with a letter formally notifying him of Galderma's decision to terminate the 2004 Agreement. When Plaintiff asked for an explanation, De Bruyne told him that Galderma did not have confidence in the patentability of the Restoraderm technology. De Bruyne did not mention that Galderma intended to utilize the Restoraderm name on other products.

As mentioned, the 2004 Agreement permitted voluntary termination, but also provided that, in the event of such termination, all "Purchased Assets" would be returned to Plaintiff. The termination letter De Bruyne provided Plaintiff in November 2009 confirmed that Galderma would return his assets in accordance with the 2004 Agreement. There was no deadline in the 2004 Agreement for returning those assets to Plaintiff.

On December 1, 2009, Plaintiff emailed De Bruyne, attaching a list of the assets he believed Galderma was required to return pursuant to the 2004 Agreement, including trademarks. De Bruyne replied, confirming that he would forward the list to his team members. Plaintiff did not receive any indication from Galderma that they disagreed with his list or that any trademark would not be returned. From late 2009 to March 2010, Galderma returned to Plaintiff the patents, patent applications, and development materials associated with the 2004 Agreement but Galderma did not return the Restoraderm trademark.

Plaintiff and De Bruyne continued their communications through December 2009 and early 2010, during which time they discussed the possibility of continuing Plaintiff's contractual relationship with Galderma. Plaintiff remained confident in his ability to patent the Restoraderm

technology and – believing that Galderma would consider reprising the contractual relationship if the technology was patented – he pursued patent applications during 2010.[11]

In February 2010, Cassady learned that Plaintiff was still using the Restoraderm name, and directed De Bruyne to ask Plaintiff to desist. De Bruyne duly emailed Plaintiff, explaining: "As you know we are the owner of this trade name and I would like to ask you not to use this name anymore in your communication on the technology . . . . I count on you for the future use." Plaintiff interpreted De Bruyne's email as cautioning him against using the Restoraderm name in case a patent was granted, in which case Galderma would consider entering into a new agreement to develop the technology.

Plaintiff responded to De Bruyne in March 2010, expressing his view that he had used the Restoraderm trade name prior to assigning it to CollaGenex in the 2002 Agreement, that the Restoraderm trademark and technology were part of the "Purchased Assets" covered by the 2004 Agreement, and that he is the rightful owner of Restoraderm. Plaintiff acknowledged that, in light of Galderma's trademark registration and given that Galderma had not yet assigned the trademark to him, Galderma was the rightful owner "for now," and he agreed not use the mark.

In May 2010, Plaintiff was invited to meet with De Bruyne in Paris, where they continued to discuss Plaintiff's progress with the Restoraderm patent applications. Once again, De Bruyne did not tell Plaintiff that Galderma intended to use the Restoraderm name on other products. A few days after the meeting, Plaintiff followed up with De Bruyne by email, outlining his proposal for a new development agreement with Galderma.

In July 2010, De Bruyne notified Plaintiff of Galderma's decision that "moving forward with a new agreement with you is not a strategic fit for the company at this time." De Bruyne

_____

[11] Plaintiff obtained a patent for Restoraderm a year later, in 2011.

also indicated that Galderma would be opposing Plaintiff's Restoraderm patent applications. De Bruyne did not mention Galderma's intent to use the Restoraderm name on its products.

In August 2010, Plaintiff's attorney forwarded him the link to an article on a rosacea support website, dated May 26, 2010, which stated that Galderma was planning to launch a new line of skincare products called "Cetaphil RestoraDERM" in August of that year. Plaintiff emailed De Bruyne on August 12, 2010, including the link and asking for clarification. De Bruyne replied, advising Plaintiff to contact Quintin Cassady, but did not confirm or deny that Galderma intended to launch the products.

On August 16, 2010, Plaintiff filed a petition before the P.T.O.'s Trademark Trial and Appeal Board ("T.T.A.B."), seeking to cancel Galderma's registration of the Restoraderm trademark.[12] *See Thomas Sköld v. Galderma Labs., Inc.*, 2012 WL 5902083 (T.T.A.B. Nov. 8, 2012). Plaintiff's cancellation petition asserted that Defendants intended to market Cetaphil Restoraderm in the United States, and attached as an exhibit the rosacea website article.

On September 14, 2010, Galderma L.P. issued a press release announcing the launch of "Cetaphil® Restoraderm®," "a new line of products to help soothe the symptoms of eczema and atopic dermatitis." The Restoraderm line would be a sub-brand of Galderma's Cetaphil line – made up of around 30 skincare products – and would consist of two products sold in the United States: a body wash and a skin moisturizer, both formulated for eczema and atopic dermatitis. The next day, Plaintiff saw the press release. Galderma has since sold its Cetaphil Restoraderm products in the United States and overseas.

---

[12] The T.T.A.B. proceeding was stayed pending the outcome of this litigation.

## IV.    DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

Turning now to Defendant's motion for judgment as a matter of law.  At the close of

Plaintiff's case, Defendants made – and the Court denied – a motion for judgment as a matter of

law pursuant to Rule 50(a) (ECF No. 146).  Defendants now renew their motion on Plaintiff's

unjust enrichment claim and ask the Court to vacate the jury's disgorgement award of $58,800.

In support of the motion, Defendants argue that: (1) Plaintiff's unjust enrichment claim is

predicated on his purported ownership of the Restoraderm trademark, but he failed to adduce

legally sufficient evidence of ownership at trial; (2) the unjust enrichment claim fails as a matter

of law because the 2004 Agreement governs the subject-matter of the parties' dispute and

precludes any unjust enrichment claim; (3) the unjust enrichment claim is barred by

Pennsylvania's four-year statute of limitations; and (4) there is no legally sufficient evidence of

any of the elements of unjust enrichment.

### 1.    Plaintiff's evidence of ownership of the mark

Defendants argue that in order to "confer" the benefit of the Restoraderm trademark as

required for unjust enrichment liability, *Northeast Fence & Iron Works, Inc. v. Murphy Quigley

Co., Inc.*, 933 A.2d 664, 669 (Pa. Super. Ct. 2007), Plaintiff must first have owned the mark.

Defendants assert that Plaintiff did not present sufficient evidence of ownership at trial, and that,

to the contrary, Galderma Inc. owned the mark pursuant to the application for registration that

CollaGenex filed on February 28, 2002, which was ultimately granted.[13]  Federal registration of

a trademark is *prima facie* evidence of the mark's validity, the registrant's ownership thereof,

and the exclusive right to use the mark in commerce.  *See* 15 U.S.C. § 1115(a); 15 U.S.C. §

1057(c).  To rebut this *prima facie* evidence of ownership, Plaintiff must have established

---

[13] Defendant Nestlé S.A. currently holds the United States and worldwide registrations for the Restoraderm trademark, having been assigned Inc.'s United States-based intellectual property in May 2015.

"priority" through his use of the mark in commerce prior to the date of CollaGenex's registration application. *See Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.*, 186 F.3d 311, 315 (3d Cir. 1999) (holding that, under the Lanham Act, filing an application for federal registration of a trademark confers priority in the mark except against a person who has used the mark prior to such filing). The issue before the Court is thus whether, viewing the evidence in the light most favorable to Plaintiff, Plaintiff adduced sufficient evidence from which the jury reasonably could find that he established priority in the mark prior to February 28, 2002.

The Court previously considered – and rejected – this argument on Defendants' motions for summary judgment and judgment as a matter of law under Rule 50(a). Defendants have identified no reason compelling a different result at this juncture. At trial, Plaintiff presented the following evidence of prior use:

- Plaintiff coined the name "Restoraderm" in the summer of 2001. He first used the word "Restoraderm" in writing in late August or early September 2001.

- Plaintiff made "batch records" – *i.e.* laboratory samples – of the Restoraderm product in the summer of 2001.

- In September 2001, Plaintiff traveled to the United States and conducted meetings and telephone calls with pharmaceutical companies that he considered prospective business partners for commercializing his technology. Plaintiff presented information on the technology, which he called "Restoraderm," during these meetings and phone calls. The prospective business partners included Allergan, Medicis, and two Johnson & Johnson companies: Ortho and Neutrogena.

- At some point before the summer of 2001, Plaintiff drafted a paper titled "A Theory of the Mode of Action," which provides a scientific hypothesis for how his skincare technology works. This paper was among the package of materials Plaintiff sent to pharmaceutical companies prior to meeting with them in September 2001. A draft of this paper prepared for CollaGenex, dated November 5, 2001, refers to the technology as "Restoraderm." Plaintiff also provided CollaGenex with hard copies of the paper. Additionally, it was distributed in Swedish universities and to a number of dermatologists around the world.

- In the summer of 2001, Plaintiff drafted a second paper, entitled "Lipoderm Restoraderm, a vehicle technology for topical use," which offers a simplified explanation of how the Restoraderm technology works. The draft of this paper prepared for CollaGenex referred to "Lipoderm," but earlier drafts did not. Plaintiff included this paper in the package of materials he sent pharmaceutical companies prior to meeting with them in September 2001.

- In late 2001 or early 2002, Plaintiff delivered a presentation to CollaGenex about his Restoraderm technology, accompanied by written materials. In addition, Plaintiff provided CollaGenex with multiple physical samples of the product, labeled "Restoraderm."

- In January 2002, Plaintiff attended the American Association of Dermatology conference in the Caribbean. He brought with him copies of a third paper, entitled "Restoraderm: a product and a dermal delivery technology," which he prepared specifically for the conference and distributed to attendees. Approximately 70 people attended the conference. Plaintiff took part in a focus group of around 10 conference attendees, at which he gave a presentation on Restoraderm and distributed labeled samples of the product. Additionally, Plaintiff informally discussed his Restoraderm technology with other conference attendees.

- Following the January 2002 conference, CollaGenex followed up with Plaintiff about developing his Restoraderm technology. On February 12, 2002, Plaintiff and CollaGenex signed the 2002 Agreement, in which "Restoraderm" was referenced by name under the "Trade Marks" heading.

Viewed in the light most favorable to Plaintiff, this represents sufficient evidence for the jury to find that Plaintiff established priority in the Restoraderm mark prior to February 28, 2002. The evidence that Plaintiff pitched his technology to at least four large pharmaceutical companies using the name "Restoraderm," distributed samples labeled "Restoraderm" to prospective business partners, and discussed his technology with dermatologists at the January 2002 conference does not merely indicate that Plaintiff was *preparing* to do business, as Defendants contend, but that he actually used the mark in commerce.

Defendants lean heavily on the fact that Plaintiff did not sell Restoraderm products to the public, arguing that he is unable to demonstrate "market penetration" among target purchasers sufficient to establish use in commerce. *See Natural Footwear Ltd. v. Hart, Schaffner & Marx*,

760 F.2d 1383, 1400 (3d Cir. 1985). But, while the *Natural Footwear* case is "applicable to the commonly recurring fact pattern of concurrent use . . . in different regions," it is distinguishable from the case at bar. *See Lucent Info.*, 186 F.3d at 316. Here, the nature of Plaintiff's product indicates that it was never intended to be directed to the public at large; rather, the target market was pharmaceutical companies and opinion leaders in the field of dermatology. Moreover, the Third Circuit has recognized that while sales may be "the typical and clearest evidence, they are not the *sine qua non* of use in commerce." *See ITT Indus., Inc. v. Wastecorp, Inc.*, 87 Fed. App'x 287, 296 n.12 (3d Cir. 2004). Similarly, the Federal Circuit has held that "one should look at the evidence as a whole, as if each piece of evidence were part of a puzzle which, when fitted together, establishes prior use." *West Florida Seafood, Inc. v. Jet Restaurants, Inc.*, 31 F.3d 1122, 1125-26 (Fed. Cir. 1994). Thus, the fact that Plaintiff did not sell products directly to consumers does not preclude a finding that he used the mark in commerce, and there was sufficient evidence for the jury to make that determination.

## 2. The 2004 Agreement

Second, Defendants argue that the existence of the 2004 Agreement precludes Plaintiff's unjust enrichment claim, pointing out that, under Pennsylvania law, the doctrine of unjust enrichment is "inapplicable when the relationship between the parties is founded on a written agreement or express contract." *Benefit Tr. Life Ins. Co. v. Union Nat'l Bank*, 776 F.2d 1174, 1177 (3d Cir.1985) (quoting *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 448 (Pa. 1969)).

This Court recognized this doctrinal limit to Plaintiff's unjust enrichment claim at the motion to dismiss stage and duly dismissed that claim against Galderma Inc., the successor-in-interest under the 2004 Agreement. Defendants now reassert their argument that the 2004 Agreement also precludes Plaintiff's unjust enrichment claim against the non-signatory

Defendants. Defendants acknowledge that no reported Pennsylvania decisions support their position, but urge the Court to follow other jurisdictions that have held that the existence of an express contract precludes an unjust enrichment claim against non-signatories where the claim arises from the same subject-matter governed by the contract. *See, e.g.*, *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (observing that New York law does not permit recovery in unjust enrichment where a valid contract governs the same subject-matter as the unjust enrichment claim); *Snyder v. Freeman*, 266 S.E.2d 593, 602-03 (N.C. 1980); *but see In re Wolf*, 556 B.R. 676, 689 n.15 (Bankr. E.D. Pa. 2016) (observing that no reported Pennsylvania decisions discuss this specific issue and declining "to opine on this question of Pennsylvania law.").

Although no reported Pennsylvania decisions resolve this specific issue, federal courts in this District have held that non-signatories to a contract may be subject to unjust enrichment claims arising out of the contract's subject-matter. *See Montanez v. HSBC Mortg. Corp. (USA)*, 876 F.Supp.2d 504, 513 (E.D. Pa. 2012) (holding that the existence of a contract precluded plaintiff's unjust enrichment claim against signatory defendant, but not against non-signatory defendant); *Furniture Solutions v. Resources & Symmetry Office, LLC*, No. 15-4774, 2015 WL 9302915, at *4 (E.D. Pa. Dec. 22, 2015) (same). This Court declines to follow the jurisprudence of other jurisdictions and instead finds that, as non-signatories to the 2004 Agreement, Galderma L.P., Galderma S.A., and Nestlé S.A. cannot rely on the existence of that contract to shield themselves from Plaintiff's unjust enrichment claim.

### 3. Statute of limitations

Third, Defendants argue that judgment as a matter of law should be granted on Plaintiff's unjust enrichment claim because it is barred by Pennsylvania's four-year statute of limitations.

*See* 42 Pa. Cons. Stat. § 5525(a)(4); *Sevast v. Kakouras*, 915 A.2d 1147, 1153 (Pa. 2007). Defendants point out that the jury found Plaintiff's breach of contract claim time-barred. They contend that because unjust enrichment is subject to the four-year same limitations period as a breach of contract claim, and because the two claims are founded on the same underlying facts, Plaintiff's unjust enrichment claim is also time-barred. Specifically, Defendants argue that Plaintiff's unjust enrichment claim accrued when Defendants failed to revert the Restoraderm trademark to him, and that any subsequent use of the mark on Cetaphil products simply represents the continued ill-effects of that initial harm.

Plaintiff responds, first, that Defendants did not seek a jury instruction on this issue or otherwise raise it at trial. Although Plaintiff is correct on this point (*see* ECF No. 132), Defendants preserved this argument by raising it when they moved for judgment as a matter of law at the close of Plaintiff's case (*see* ECF No. 146 at 22-23).

As to the merits of Defendants' argument, Plaintiff does not dispute that his unjust enrichment claim is governed by the same four-year statute of limitations period as his breach of contract claim. He responds, rather, that the two claims accrue at different times, pointing out that the elements of unjust enrichment differ from those of breach of contract. Plaintiff argues that under Pennsylvania law, an unjust enrichment claim accrues when the defendant accepts and retains the benefits in question – which is not necessarily the same date as breach of the contract. *See Konidaris v. Portnoff Law Assoc., Ltd.*, 884 A.2d 348, 355 (Pa. Cmwlth. 2005) (holding that a cause of action for unjust enrichment "accrues . . . when the defendant receives and retains benefits."), *aff'd in part and rev'd in part on other grounds*, 953 A.2d 1231 (Pa. 2008)); *see also Harry Miller Corp. v. Mancuso Chems. Ltd.*, 469 F.Supp.2d 303, 319 (E.D. Pa. 2007) (same). According to Plaintiff, because each sale of a Cetaphil product bearing the Restoraderm

trademark is a distinct benefit accepted and retained by Defendants, Defendants continue to be unjustly enriched by the ongoing sales of Cetaphil Restoraderm.

Plaintiff's unjust enrichment claim was based primarily on the argument that it was inequitable for Defendants to profit from the Restoraderm trade name without compensating him. That claim did not accrue when Defendants failed to revert the trademark to Plaintiff, but when Defendants received and retained the benefits of the mark. Since Plaintiff filed his Complaint on September 15, 2014, his unjust enrichment claim would be time-barred only as to profits received and retained by Defendants more than four years previously. *See Harry Miller*, 469 F.Supp.2d at 319 (holding that plaintiff's claim for unjust enrichment accrued when defendant began profiting from sales). Defendants did not identify any sales of Cetaphil Restoraderm products prior to issuance of the press release on September 14, 2010. Indeed, both parties' damages experts calculated disgorgement of profits – the proper measure of money damages for unjust enrichment[14] – based on sales of Cetaphil Restoraderm from 2010 until 2016. Consequently, Defendants have not carried their burden of showing that any part of Plaintiff's unjust enrichment award was time-barred.

### 4. Evidence to support unjust enrichment

Finally, Defendants move for judgment as a matter of law on the theory that there is insufficient evidence in the record to support Plaintiff's unjust enrichment claim. Defendants reiterate their position that they own the Restoraderm trademark by virtue of CollaGenex's federal registration of the mark – not as a result of any benefit conferred by Plaintiff. Additionally, they argue that Plaintiff presented no evidence from which a reasonable fact-finder

---

[14] *See, e.g., Marshak v. Treadwell*, 595 F.3d 478, 495 (3d Cir. 2009) ("We have held that an accounting of the infringer's profits is available if the defendant is unjustly enriched . . . .") (internal quotation omitted); *Curley v. Allstate Ins. Co.*, 289 F.Supp.2d 614, 619 (E.D. Pa. 2003) ("Where there has been unjust enrichment, the courts will imply a quasi-contract . . . and require the defendant to pay the plaintiff the value of the benefit conferred.") (citing *Crawford's Auto Center v. State Police*, 655 A.2d 1064, 1070) (Pa. Commw. Ct. 1995).

could determine that it would be inequitable for Defendants to retain the benefit of the mark. According to Defendants, the jury's findings on trademark infringement and false advertising make clear that they were not inequitably enriched.

This argument is unavailing, particularly in light of the Court's duty to read a jury verdict in a manner that resolves inconsistencies. *See Graboff v. Colleran Firm*, 744 F.3d 128, 138 (3d Cir. 2014). As discussed *supra*, Plaintiff adduced sufficient evidence from which the jury reasonably could find that he had ownership rights in the Restoraderm mark through use in commerce prior to February 28, 2002, and thus that Plaintiff conferred a benefit upon Defendants. As to the remaining elements of unjust enrichment, Defendants' argument questions the credibility of several days' worth of testimony relating to inequitable enrichment. Cassady testified, for example, that the name is valuable because it is "catchy" and because it "medicalized" the sub-brand of Cetaphil eczema products. Cindy Wright, a Galderma employee responsible for the Cetaphil brand, also testified that the name medicalized the product and helped consumers differentiate the Restoraderm sub-brand from the core Cetaphil line. Additionally, Plaintiff adduced evidence that Galderma failed to advise him that it did not intend to return the trademark to him, even after he specifically asked for it back in December 2009, and that Galderma employees demonstrated a willingness to revive the contractual relationship with him in 2010. Furthermore, he adduced evidence that Galderma decided to utilize the trademark on its own products without making any efforts to determine the meaning of the 2002 and 2004 Agreements.

Evaluating the credibility of this testimony was the role of the jury. *See Lightning Lube*, 4 F.3d at 1166. If credited, this evidence provided ample support for the jury reasonably to conclude that Plaintiff conferred benefits upon Defendants, who appreciated, accepted, and

retained such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. *See Northeast Fence*, 933 A.2d at 669. Notably, the jury found that Defendants' conduct in connection with their use of the mark was outrageous and awarded $550,000 in punitive damages. This undercuts Defendants' suggestion that the jury's findings make clear that Defendants were not inequitably enriched. Accordingly, there was plainly evidence upon which the jury could properly find a verdict for Plaintiff on unjust enrichment, and Defendants' motion is denied.[15]

## V.    PLAINTIFF'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### 1.    Rule 50(a)

Plaintiff's motion for judgment as a matter of law presents a procedural wrinkle, namely whether he properly preserved his right to file it. In order to preserve an issue for a post-trial motion under Rule 50(b), the moving party must seek judgment as a matter of law at the close of the nonmovant's case pursuant to Rule 50(a). *See Lightning Lube*, 4 F.3d at 1172-73; Fed. R.

---

[15] Defendants argue, in the alternative, that even if their Motion is denied, the final judgment improperly assesses costs against Defendants and should be altered or amended pursuant to Federal Rule of Civil Procedure 59(e). First, Defendants assert that Plaintiff is not entitled to costs under Rule 54(d)(1) because he was only partially successful at trial. Defendants point out that the jury rejected all but one of Plaintiff's six claims under federal and state law, and awarded only "a small fraction" of the millions of dollars of damages sought. Defendants submit that they are the "prevailing party" for purposes of Rule 54(d)(1) or, alternatively, that neither party is entitled to costs. *See Compro-Frink Co. v. Valk Mfg. Co.*, 595 F.Supp. 302, 303-04 (E.D. Pa. 1982) (finding that there was no prevailing party where the litigation "resulted in a tie."). This argument is unpersuasive. The standard used for determining prevailing party status in this Circuit is "whether plaintiff achieved some of the benefit sought by the party bringing the suit." *Institutionalized Juveniles v. Sec'y of Pub. Welfare*, 758 F.2d 897, 910 (citations and internal quotation omitted). The focus of this inquiry is "on the relief actually obtained rather than on the success of the legal theories." *Id.* at 911. Because the jury found for Plaintiff on his unjust enrichment claim and awarded relief in the amount of $58,800, he is the prevailing party. Prevailing parties are presumptively entitled to costs under Rule 54(d)(1) in the absence of some "defection" justifying the denial of costs; limited success is not such a defection. *Id.* at 926. Consequently, Plaintiff is entitled to costs under Rule 54(d)(1). Second, Defendants point out that the judgment awards costs against *all* Defendants, but the $58,800 award for unjust enrichment is only against Galderma L.P., Galderma S.A., and Nestlé S.A. Because the Court previously dismissed Plaintiff's unjust enrichment claim as to Galderma Inc., *Sköld v. Galderma Labs., L.P.*, 99 F.Supp.3d 585, 599 (E.D. Pa. 2015), the judgment shall be modified pursuant to Federal Rule of Civil Procedure 59(e) to reflect a costs award only against the Defendants found liable for unjust enrichment.

Civ. P. 50(b) ("If the court does not grant a motion for judgment as a matter of law made under 50(a) . . . the movant may file a renewed motion for judgment as a matter of law . . . ."). Absent a Rule 50(a) motion, "judicial reexamination of the evidence abridges a party's right to a trial by jury." *Id.* Furthermore, a post-trial motion for judgment as a matter of law can be granted only on grounds advanced in the pre-verdict motion. Fed. R. Civ. P. 50, 1991 Advisory Committee's Note; *see also Lightning Lube*, 4 F.3d at 1173.

Although Plaintiff did not make a request for judgment as a matter of law that he labeled as a Rule 50(a) motion, he submitted proposed jury instructions (ECF No. 153),[16] one of which was entitled "Directed Verdict as to Confusion," wherein he sought an instruction directing the jury to find likelihood of confusion on Plaintiff's trademark infringement and unfair competition claims. The Court will treat this jury instruction as a motion for directed verdict. *See Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 814-15 (3d Cir. 1984); *Intermilo, Inc. v. I.P. Enterprises, Inc.*, 19 F.3d 890, 892-93 (3d Cir. 1994). However, because Plaintiff's proposed jury instructions sought judgment as a matter of law only as to likelihood of confusion, only that ground for relief will be considered under the standard articulated in Rule 50(b).

### 2. Likelihood of confusion

Plaintiff argues that the jury's trademark infringement and unfair competition findings were erroneous as a matter of law. To establish trademark infringement and unfair competition, Plaintiff was required to show that he owned a valid and legally protectable trademark, and that Defendants' use of that mark caused a likelihood of confusion. *See A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Although the jury found that

---

[16] Prior to trial, on June 20, 2016, Plaintiff filed a first set of proposed jury instructions (ECF No. 134), one of which he labeled "Directed Verdict as to Confusion." Because a party must move for judgment as a matter of law under Rule 50(a) at the <u>close</u> of the nomovant's case, *see Lightning Lube*, 4 F.3d at 1172, this set of jury instructions does not meet the procedural requirements of Rule 50(a).

Plaintiff established rightful ownership of the Restoraderm mark, it also found that it was not likely that the relevant market for purchasers of the products offered by either Plaintiff or Galderma would be confused as to their source.

Plaintiff argues that the jury's no-confusion finding is erroneous as a matter of law. He suggests that because his trademark is identical to the allegedly infringing trademark, a likelihood of confusion is inevitable. *See id*. at 211 (holding that courts need not look beyond the marks when goods are directly competing and the marks are virtually identical); *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998). According to Plaintiff, the only possible explanation for the jury's finding on confusion is that it mistakenly concluded that, in order to find a likelihood of confusion, Plaintiff must have had a competing product on the market at the same time as Galderma's Cetaphil Restoraderm products that also bore the Restoraderm trade name. Plaintiff, citing *Interpace v. Lapp*, 721 F.2d 460 (3d Cir. 1983) – finding plaintiff entitled to injunctive relief for trademark infringement notwithstanding that plaintiff had never actually entered defendant's market – argues that such a conclusion would be incorrect. Additionally, Plaintiff explains that the reason he did not have a competing product on the market was because Galderma warned him not to use the Restoraderm trademark. He contends that Defendants should not be permitted to profit from their own misconduct.

The question before the Court is thus whether, viewing the evidence in the light most favorable to Defendants, there was insufficient evidence from which a jury reasonably could find likelihood of confusion. *See Lightning Lube*, 4 F.3d at 1166. A review of the trial record indicates that Plaintiff has not made out this showing. Plaintiff points to his testimony that, at the American Association of Dermatology conference in January 2011, around twenty conference attendees congratulated him on getting Restoraderm to market or asked him to clarify

whether Cetaphil Restoraderm was based on his technology; and that internet researchers associated with an Australian company ordered Galderma's Cetaphil Restoraderm products in an attempt to conduct studies on Plaintiff's Restoraderm technology, as establishing likelihood of confusion.

Although this evidence certainly supports Plaintiff's theory of likely confusion, it does not dictate the conclusion that the jury's finding was erroneous as a matter of law. Likelihood of confusion is determined by a number of factors, including, *inter alia*, the degree of similarity between the owner's mark and the alleged infringing mark; the strength of the mark; any factors indicative of the care and attention expected of relevant consumers; the length of time the defendant used the mark without evidence of actual confusion arising; the intent of the defendant in adopting the mark; evidence of actual confusion; whether the goods, though not competing, were marketed through the same channels of trade and advertised through the same media; the extent to which the targets of the parties' sales efforts were the same; the relationship of the goods in the minds of consumers because of the similarity of function; and other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market. *See Lapp*, 721 F.2d at 463; *see also A&H*, 237 F.3d at 207 (holding that the *Lapp* factors apply to cases involving both competing and non-competing goods). None of these factors are determinative and each must be weighed and balanced against the others. *Checkpoint Systems, Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 280 (3d Cir. 2001).

Plaintiff argues that the jury needed to consider only the first *Lapp* factor – the degree of similarity between the owner's mark and the alleged infringing mark – to find likely confusion, pointing out that his mark is identical to the allegedly infringing mark. But in making this

argument, Plaintiff relies on cases in which identical marks were concurrently used by unrelated entities on directly competing products. *See Pappan*, 143 F.3d at 804; *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990); *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 137 (3d Cir. 1982). Plaintiff acknowledges that there was no concurrent use in this case. As such, "the similarity of the marks [was] only one of a number of factors . . . to determine likelihood of confusion." *Fisons Horitculture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 473 (3d Cir. 1994); *see also Richards v. Cable News Network, Inc.*, 15 F.Supp.2d 683 (E.D. Pa. 1998) (finding no likelihood of confusion despite use of an identical name).

Here, the jury was charged on the *Lapp* factors and instructed to consider all relevant evidence in determining likelihood of confusion, including the fact that the two marks were identical. Given that a jury is presumed to follow the Court's instructions when arriving at its verdict, *Graboff*, 744 F.3d at 135 n.5, Plaintiff has identified no reason to overturn its finding that confusion was not likely. Consequently, Plaintiff has not established that judgment as a matter of law is warranted on his trademark infringement and unfair competition claims.

## VI. PLAINTIFF'S MOTION FOR NEW TRIAL

Concurrent with his motion for judgment as a matter of law, Plaintiff moves, in the alternative, for a new trial on all claims pursuant to Rule 59. In support of this motion, he argues that: (1) the jury's no-confusion finding is contrary to the weight of the evidence; (2) the jury's false advertising findings were inconsistent and contrary to the weight of the evidence; and, (3) the Court should not have permitted Defendants to assert a statute of limitations defense to his breach of contract claim.

### 1.  Trademark infringement and unfair competition

Turning to Plaintiff's motion for a new trial on his trademark infringement and unfair competition claims, the question before the Court is whether the jury's finding on likely confusion is contrary to the great weight of the evidence such that the verdict resulted in a miscarriage of justice, cries out to be overturned, or shocks the conscience.  *See Pryer*, 251 F.3d at 453; *Williamson*, 926 F.2d at 1353.

In support of his motion, Plaintiff leans heavily on the fact that he adduced evidence of actual confusion, pointing to his testimony that conference attendees and internet researchers exhibited confusion as to the source of Cetaphil Restoraderm products.  While evidence of actual confusion is undoubtedly significant to the likelihood of confusion analysis, it is not determinative.  *See Lapp*, 721 F.2d at 463.  First, Plaintiff did not elicit trial testimony from any of the allegedly confused individuals, which deprived defense counsel of the opportunity to cross-examine those persons.  *See A&H*, 237 F.3d at 227.  Second, likelihood of confusion requires that an appreciable segment of the relevant audience would be confused by the marks. *See, e.g.*, *id.* (affirming district court's finding that evidence of actual confusion was isolated and idiosyncratic); *Checkpoint Sys.*, 269 F.3d at 298-99 (holding that twenty instances of confusion over five years was *de minimis*).  Thus, even if Plaintiff's testimony as to the conference attendees and internet researchers is credited, it arguably evidences only isolated and idiosyncratic evidence of actual confusion.  *See A&H*, 237 F.3d at 227 (cautioning against using "isolated instances of confusion to buttress a claim.").  Furthermore, the sophistication of the target market in this case – namely, pharmaceutical companies and opinion leaders in the field of dermatology – weighs against a likelihood of confusion.  *Id*; *see also Castle Oil Corp. v. Castle*

*Energy Corp.*, 26 U.S.P.Q.2d 1481, 1489, 1992 WL 394932 (E.D. Pa. 1992) (finding no likelihood of confusion where buyers were knowledgeable professionals).

Thus, although Plaintiff adduced some evidence of actual confusion, that evidence was not of such great weight that permitting the jury verdict to stand would result in a miscarriage of justice. Consequently, Plaintiff's motion for a new trial is denied on this ground.

### 2. False advertising

Plaintiff argues that the jury's findings on his false advertising claim were inconsistent and against the weight of the evidence. In answering the verdict interrogatories, the jury found, as to Question 3(a), that Galderma's use of the term "Restoraderm" on its Cetaphil products was false or misleading. As to Question 3(b), the jury found that use of that term on Cetaphil products did not deceive, or have the capacity to deceive, a substantial segment of customers in the marketplace for those products. Defendants respond, first, that these findings are not irreconcilably inconsistent, and instead represent the jury's determinations on independent elements of the false advertising claim. Second, Defendants respond that the trial record contains no evidence that a substantial segment of the market was deceived by Galderma's use of "Restoraderm" on Cetaphil products.

### a. Verdict interrogatories

When faced with a seemingly inconsistent verdict, a court is under a constitutional mandate to search for any view of the case that reconciles the jury's findings. *See Graboff*, 744 F.3d at 138-39; *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 494 (3d Cir. 1991) (characterizing duty to resolve inconsistencies in jury verdicts as a constitutional obligation); *see also Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000)

("[I]nconsistent jury verdicts are an unfortunate fact of life in law, and should not, in and of themselves, be used to overturn otherwise valid verdicts.").

Here, the jury's findings can be harmonized. Consistent with the elements of false advertising under the Lanham Act, Question 3(a) asked whether use of the term "Restoraderm" on Cetaphil products was false or misleading. *See Groupe SEB*, 774 F.3d at 198. The jury answered in the affirmative. Question 3(b) asked whether use of the term deceived, or had the capacity to deceive, a substantial segment of customers in the marketplace for Cetaphil products. The jury answered in the negative. Thus, the jury may have found that Galderma's use of "Restoraderm" was false or misleading in that Cetaphil products do not contain Plaintiff's technology, but that a "substantial segment" of customers in the relevant marketplace was not misled. The fact that the jury found no likelihood of confusion on trademark infringement and unfair competition, as discussed *supra*, supports this reading of the verdict.

Bearing in mind that courts have "very limited discretion" in this area and must mold a verdict "consistently with a jury's answers to special interrogatories when there is *any view* of the case which reconciles the various answers," *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 763 (3d Cir. 1990) (emphasis in original) (quotation and citation omitted), Plaintiff has not established that the jury's verdict is inconsistent such that a new trial is warranted.

### b. Weight of the evidence

Plaintiff has not demonstrated that the jury's answer to Question 3(b) – *i.e.* that use of the term "Restoraderm" on Cetaphil products did not deceive, or have the capacity to deceive, a substantial segment of customers in the marketplace for those products – was against the weight of the evidence such that a new trial is warranted. *See Pryer*, 251 F.3d at 453; *Williamson*, 926

F.2d at 1353. Indeed, Plaintiff gives short shrift to this issue in his briefing and makes no reference to the evidence adduced at trial in support of his argument.

False advertising liability requires that the advertising in question tends to deceive or mislead a "substantial portion" of the intended audience. *See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 134 n.14 (3d Cir. 1994) (finding survey evidence showing deception among 7.5% of consumers insufficiently substantial, but suggesting that 20% may suffice); *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 594 (3d Cir. 2002) (finding survey evidence demonstrating that 15% of respondents were misled sufficiently substantial).

As discussed *supra*, Plaintiff testified that around twenty conference attendees and an unspecified number of internet researchers exhibited confusion – and thus arguably deception – as to the source of the Restoraderm mark on Cetaphil products. He presented no market survey evidence to demonstrate confusion or deception. *See, e.g.*, *McNulty v. Citadel Broad. Co.*, 58 Fed. App'x 556, 566 (3d Cir. 2003) (noting lack of consumer survey evidence that could "provide proof that a substantial portion of the intended audience, not just a few select individuals, had been misled."). Accordingly, the record does not support Plaintiff's argument that the false advertising finding was against the weight of the evidence.

### 3. Statute of limitations defense

Plaintiff argues that Defendants should not have been permitted to assert a statute of limitations defense at trial because Galderma fraudulently misled him into believing that they would not breach the 2004 Agreement. *See Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005) (holding that under doctrine of fraudulent concealment, "the defendant may not invoke the

statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts.").

The Court determined that the issue of whether fraud or concealment by Defendants caused Plaintiff to delay in bringing his breach of contract claim was a question for the fact-finder, and duly submitted that issue to the jury.[17]  That determination was consistent with Pennsylvania law.  *See id*. at 862 (holding that, where genuine issues of material fact exist as to whether the doctrine of fraudulent concealment tolls the statute of limitations, it is for the jury to determine whether the doctrine applies).  The jury thus considered and rejected the proposition that Defendants were estopped from asserting a statute of limitations defense as a result of fraud or concealment.

The jury's determination was supported by sufficient trial evidence.  Cassady offered an explanation for Galderma's failure to notify Plaintiff that it would be using the Restoraderm mark on Cetaphil products: namely that Galderma employees were constrained from such disclosure by confidentiality concerns, particularly in light of Plaintiff's connections to the pharmaceutical industry.  As to Galderma's communications with Plaintiff after termination of the 2004 Agreement, Cassady testified that the purpose of these continued discussions was potential business development; in other words, to afford Plaintiff an opportunity to present a novel proposal that might lead Galderma to reconsider.  De Bruyne's testimony was consistent with this account: he testified that his communications with Plaintiff in 2010 were part of a sincere effort to explore reviving the contractual relationship between Plaintiff and Galderma.

---

[17] The Court instructed the jury, in relevant part: "A defendant may be estopped from asserting a statute of limitations defense if through fraud, deception or concealment of facts a defendant lulls an injured person or his representatives into a sense of security so that such person's vigilance is relaxed.  It is the plaintiff's duty to use reasonable diligence to properly inform himself of the facts and circumstances of the injury."

This evidence is sufficient to support the jury's finding that the doctrine of fraudulent concealment did not toll the statute of limitations.

The jury's punitive damages award does not compel a contrary conclusion. The jury was instructed, consistent with Pennsylvania law, that punitive damages may be awarded on the basis that Defendants' conduct exhibited reckless indifference to Plaintiff's rights.[18] Thus, the jury may have awarded such damages on finding that Defendants acted recklessly by utilizing the Restoraderm mark without determining whether they had the contractual rights to do so under the 2004 Agreement. The punitive damages award does not necessarily indicate that the jury found Plaintiff to be fraudulently misled into believing that Galderma Inc. would not breach the 2004 Agreement. Consequently, its decision not to apply the doctrine of fraudulent concealment is not contrary to the weight of the evidence, and Plaintiff's motion is denied on this ground.

### 4. New trial on damages

Plaintiff also moves for a new damages trial on his unjust enrichment claim, arguing that the Court erroneously limited the trial evidence to Galderma's sales of Cetaphil Restoraderm within the United States when it should have allowed evidence of global sales. Specifically, Plaintiff alleges error in the Court's order of June 24, 2016, in which the Court found foreign use of the Restoraderm mark beyond the scope of Plaintiff's Lanham Act claims, but ruled that Plaintiff's common law claims – including unjust enrichment – were not limited to use of the mark within the Commonwealth of Pennsylvania. *Sköld v. Galderma Labs., L.P.*, No. 14-5280 (E.D. Pa. June 24, 2016).

---

[18] The Court allowed the jury to consider punitive damages on Plaintiff's unfair competition claim under Pennsylvania tort law. Pennsylvania has adopted § 908 of the Restatement (Second) of Torts, which provides, in relevant part: "Punitive damages may be awarded for conduct that is outrageous, because of . . . his reckless indifference to the rights of others." RESTATEMENT (SECOND) OF TORTS § 908(2) (1979). The verdict interrogatory on punitive damages read as follows: "Do you find that the defendants' conduct in connection with the Restoraderm® trademark was outrageous (i.e., conduct that was malicious, wanton, willful, or oppressive, or showed reckless indifference to the interests of others)?"

Plaintiff contends that the Court's ruling on his common law claims did not permit introduction of any evidence that would have contradicted its ruling as to his Lanham Act claims, *i.e.* evidence of global sales. Thus, in accordance with the Court's order, Plaintiff restricted his trial presentation on damages to sales of Cetaphil Restoraderm within the United States.[19] Plaintiff contends that Pennsylvania unjust enrichment law does not draw any distinction between state, national, or international sources of the enrichment. He argues that, because the jury found him to be the owner of the Restoraderm mark, he is entitled to a new trial to establish damages on all sources of Galderma's unjust enrichment. Defendants respond that Plaintiff's unjust enrichment claim is premised on his ownership of the Restoraderm trademark, which is territorially limited to the United States. *See Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 714 (3d Cir. 2004). According to Defendants, because Plaintiff presented no evidence that he owned foreign rights in the mark, global sales of Cetaphil Restoraderm are irrelevant to his unjust enrichment claim.

The verdict interrogatory on unjust enrichment, agreed to by the parties, stated: "Were Defendants unjustly enriched by the use of the RESTORADERM® trademark?"[20] Thus, the jury found that Defendants were unjustly enriched by their use of the registered mark – not by deriving profits from a benefit conferred by Plaintiff. As Plaintiff acknowledged in his Amended Complaint, Defendant Nestlé S.A. holds worldwide registration of the Restoraderm trademark. At trial, Plaintiff did not argue that he had prior rights in the Restoraderm mark outside the

---

[19] In support of this argument, Plaintiff attaches to his motion Trial Exhibits 104 and 119, which were redacted to remove any references to global sales of Cetaphil Restoraderm. Additionally, Plaintiff notes that his damages expert, Dr. Schwartz, testified only as to United States sales figures.

[20] This language tracks the unjust enrichment interrogatory provided by Plaintiff pre-trial in a proposed verdict sheet, which read: "Do you find that the Defendants have been unjustly enriched by their actions with respect to the Restoraderm trademark?" *See* ECF No. 126.

United States,[21] and he points to no authority to support the proposition that Defendants were unjustly enriched by using the mark in jurisdictions in which he does not assert ownership rights. Accordingly, his motion for a new trial on damages based on global sales of Cetaphil Restoraderm is denied.

## VII. PLAINTIFF'S REQUEST FOR INJUNCTIVE AND DECLARATORY RELIEF

Finally, Plaintiff reasserts his argument that he is entitled to injunctive and declaratory relief. The Court previously considered and rejected this argument when it ruled on Plaintiff's Request to Enter Proposed Judgment (ECF No. 159).

### 1. Injunctive relief

Injunctive relief is not available on Plaintiff's Lanham Act claims, since those claims were rejected by the jury. *See, e.g.*, *Ciba-Geigy*, 747 F.2d at 850 ("In deciding whether a permanent injunction should be issued, the court must determine if the plaintiff has actually succeeded on the merits (i.e. met its burden of proof)."); *State Troopers Fraternal Ass'n of New Jersey, Inc. v. New Jersey*, 585 F. App'x 828, 830 (3d Cir. 2014) ("A permanent injunction requires actual success on the merits.").

Although Plaintiff succeeded on his unjust enrichment claim, Plaintiff is not entitled to permanent injunctive relief on that claim because, under Pennsylvania law, restitution in the form of disgorgement is the proper remedy for unjust enrichment. *See, e.g.*, *Marshak v. Treadwell*, 595 F.3d 478, 495 (3d Cir. 2009); *Diesel v. Caputo*, 366 A.2d 1259, 1264 (Pa. Super. 1976) ("It is hornbook law that restitution as a form of relief in assumpsit is in the nature of disgorging the amount of unjust enrichment, if any, to the defendant."). The jury awarded

---

[21] Defendants note that Plaintiff's meetings with pharmaceutical companies in the fall of 2001 all occurred within the United States, and the Caribbean conference in January 2002 took place in Puerto Rico. Although Plaintiff testified as to his use of the mark in Sweden prior to February 28, 2002, he did not argue that this amounted to foreign rights in the mark.

$58,800 in disgorgement of profits, a figure supported by the trial record.[22]  Plaintiff has pointed

to no authority to support his argument that he is entitled to permanent injunctive relief to

remedy unjust enrichment, particularly given the jury's no-confusion and no-deception findings

on his Lanham Act claims.

## 2. Declaratory relief

Likewise, Plaintiff was required to prevail on the merits to obtain declaratory relief.  *See,*

*e.g.*, *Scott*, 1998 WL 57671, at *10 (finding plaintiffs not entitled to declaratory or injunctive

relief where they did not succeed on their claim, notwithstanding findings in their favor).  In his

Request to Enter Proposed Judgment, Plaintiff sought declarations that: (1) he is the sole and

exclusive owner of the Restoraderm trademark and is entitled to use the mark "without

interference"; and (2) Defendants' use of the mark is "false and misleading."  The Court denied

this request, reasoning that the declarations requested did not align with the elements of unjust

enrichment – the only claim on which Plaintiff prevailed.  *See USX Corp. v. Barnhart*, 395 F.3d

161, 166 (3d Cir. 2004) (holding that "the court cannot provide a remedy, even if one is

demanded, when plaintiff has failed to set out a claim for relief.") (quotation omitted).

In the motion *sub judice*, Plaintiff argues that declaratory relief would be proper if the

Court finds that the jury should have been instructed to find a likelihood of confusion with

respect to his Lanham Act claims.  Because the Court does not so find, that argument is

---

[22] Defendants' damages expert, Mr. Drews, testified that the proper method for calculating unjust enrichment damages is, first, to quantify the amount of sales attributable to use of the trademark.  Drews testified that, based on his review of trademark agreements between Galderma and other parties, an appropriate figure for use of the Restoraderm mark was 0.5%.  Applying this percentage to the $56 million sales generated by Cetaphil products equates to $280,000.  Drews testified that the second step in calculating unjust enrichment damages is to apply the appropriate profit margin, *i.e.* revenues after deducting costs.  Cassady testified during deposition, read into the trial record, that the profit margin on Cetaphil Restoraderm products was 21%.  Applying this percentage to $280,000 equates to $58,800.

inapposite.  However, to the extent that Plaintiff seeks declaratory relief purely on his unjust enrichment claim, such relief is available.[23]

## VIII. CONCLUSION

Defendants have failed to demonstrate that the jury lacked sufficient evidence to render its verdict.  Accordingly, their Rule 50(b) motion is denied.  Defendants have established, however, that the judgment should reflect a costs award only against Defendants Galderma L.P., Galderma S.A., and Nestlé S.A., and the judgment shall be so modified pursuant to Rule 59(e).

Plaintiff has not established that entry of judgment as a matter of law is warranted under Rule 50(b), nor that the Court should order a new trial pursuant to Rule 59.  To the extent that he moves for declaratory relief on his unjust enrichment claim, however, his motion is granted and the judgment shall be so modified.


**Dated:** August 29, 2017.

**BY THE COURT:**


**/s/Wendy Beetlestone, J.**


_____

**WENDY BEETLESTONE, J.**

---

[23] Plaintiff submitted a Revised Judgment on Jury Verdict (ECF No. 188-3), which states, *inter alia*: "[T]hat Defendants are unjustly enriched by their use of the Restoraderm mark."